# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 37360

<table>
<tr><td>

LESIA KNOWLTON,

  Claimant/Appellant/Cross-Respondent,

v.

WOOD RIVER MEDICAL CENTER,
Employer; FREMONT COMPENSATION
INSURANCE COMPANY, Surety; and
IDAHO INSURANCE GUARANTY
ASSOCIATION, Party of Interest,

  Defendants/Respondents/Cross-
  Appellants.
_____

</td><td>

)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)

</td><td>

Boise, May 2011 Term

2011 Opinion No. 62

Filed:  May 26, 2011

Stephen W. Kenyon, Clerk

</td></tr>
</table>

Appeal from the Industrial Commission of the State of Idaho.

The decision of the Industrial Commission is affirmed.

Troupis Law Office, P.A., Eagle, and R. Brad Masingill, Weiser, for appellant. Christ T. Troupis argued.

Anderson Julian & Hull, LLP, Boise, for respondents. Matthew O. Pappas argued.

_____

J. JONES, Justice.

Lesia Knowlton appeals the Industrial Commission's determination that she is not entitled to workers' compensation benefits because she failed to demonstrate that her medical symptoms were causally related to an accident that occurred during the course of her employment.  We affirm.

## I.
### Factual and Procedural Background

During all times relevant to this appeal, Lesia Knowlton was employed as a unit secretary at Wood River Medical Center. On September 12, 2000, Knowlton was working at her assigned station when a toilet or bathroom floor drain in a patient's room became clogged. The patient's

1

room was located near the area where Knowlton was working. One of the maintenance workers at the hospital used a chemical to remedy the problem. The chemical produced a foul odor, which Knowlton described as an "orange citrusy" smell. In an effort to ventilate[1] the patient's room, the hospital staff placed a fan in the doorway of the room, which blew air past Knowlton's station until her shift ended at approximately 4:00 p.m.[2] After several people complained about the odor, the director of nurses and the infection control nurse decided to move the patient from the room where the chemical was used to a different room in the hospital. According to Knowlton, the odor got stronger as the day went on, and she began smelling an odor resembling "rotten eggs" coming from the kitchen. Kitchen personnel informed her that the smell was coming from the drains. Knowlton developed a headache as a result of breathing the odor.

After returning home after her shift ended, Knowlton developed a cough and body aches. The following day, Knowlton had to leave work around lunchtime because her symptoms had worsened. Knowlton was only able to work a partial shift on September 14. On September 15, three days after the incident, Knowlton sought medical treatment from Laria Thomas, a nurse practitioner. During this visit, Knowlton reported that she was experiencing a cough, a sore throat, and burning when she would breathe. Knowlton was prescribed antibiotics, cough syrup, and an inhaler. A chest x-ray taken on a follow-up visit with Thomas was normal.

Knowlton returned to work on September 18, and was told that the chemical used on the day of the incident contained sulfuric acid.[3] The following day, Knowlton filled out and signed a Form 1 Report of Injury or Illness.

Knowlton visited Dr. Thomas Pryor on September 25. Dr. Pryor's notes from the visit indicate that Knowlton had a cough and bronchitis-like sounds in her lungs. During a follow-up visit on September 28, Knowlton complained of a sore throat and a sore chest from coughing. Dr. Pryor also noted that her sinuses were inflamed, and provided her with a release from work. By October 4, Dr. Pryor noted that the sinus inflammation had "improved profoundly." On the same

---

[1] Knowlton testified that there was no central air conditioning in the area in which she was working, and the area was not well-ventilated.

[2] Knowlton initially testified during her deposition that she worked from 8:00 a.m. until 11:30 p.m. However, after reviewing documents prior to the hearing, she determined that she had worked from 8:00 a.m. until approximately 4:00 p.m.

[3] Knowlton testified that she learned this information from Jody Alverson, the infection control nurse. Knowlton also testified that her former attorney was given a Material Safety Data Sheet for a drain cleaner called Biatron United 77. Although it was never conclusively determined precisely to what chemical Knowlton was exposed, the parties proceeded under the assumption that Knowlton was likely exposed to sulfuric acid.

day, nurse practitioner Thomas also provided Knowlton with a release from work retroactive to the day of the incident. The next day, Knowlton phoned Thomas and reported that she had another negative reaction after being exposed to other cleaners at work.

On October 13, on the advice of Dr. Pryor, Knowlton visited Dr. Ronald Fullmer, a pulmonologist. During this visit, Knowlton complained of shortness of breath and hoarseness. Knowlton also complained that her symptoms increased when exposed to animals, cold air, smoke, and perfume. Dr. Fullmer recognized some vocal distortion, but mentioned that it became more normal when she was not speaking about her initial exposure to the chemical. Dr. Fullmer's examination indicated that Knowlton's head, eyes, ears, nose, and throat were normal. A medical history taken during that visit indicated that Knowlton had been smoking cigarettes for "less than one year." According to Knowlton, she smoked prior to the chemical exposure but quit after the incident.

On October 25, nurse practitioner Thomas prescribed Wellbutrin at Knowlton's request to help her quit smoking. On December 11, Knowlton reported to nurse practitioner Thomas that she had experienced a negative reaction to food on two occasions during which her eyes became itchy and her throat and chest became red. Thomas' notes indicate that Knowlton wondered if she was reacting to some sulfa-containing component in the food. On December 20, Knowlton visited Dr. Fullmer complaining that her symptoms had increased after being exposed to odors from the new carpet and furnishings at her place of employment. Knowlton also mentioned having negative reaction to foods.

On the advice of Dr. Fullmer, Knowlton went to see Dr. Richard Henry, an allergist. While visiting Dr. Henry, Knowlton complained of episodic hoarseness, chest tightness, shortness of breath, and nasal congestion following exposure to strong odors, aerosol sprays, perfumes, and scented soaps. She also mentioned that any products containing sulfur especially aggravated her symptoms. Dr. Henry recommended that Knowlton undergo allergy skin testing.

In January of 2001, Knowlton began to see another pulmonologist, Dr. Holly Carveth. Dr. Carveth determined that Knowlton was suffering from reactive airway disease (RADS),[4] as well as

---

[4] RADS is the development of an asthma-like condition resulting from exposure to a respiratory irritant. RADS is also commonly referred to as irritant-induced asthma.

gastroesophageal reflux disease (GERD).[5] Dr. Carveth referred Knowlton to a speech and language pathologist to treat her vocal distortion. Dr. Carveth also noted that Knowlton had to be careful about what she ate due to the onset of new food allergies. Knowlton was prescribed Prilosec to treat the GERD symptoms.

In June of 2001, Fremont Compensation Insurance Company (Fremont), Wood River Medical Center's insurance company, requested Dr. Fullmer's opinion regarding Knowlton's exposure to sulfuric acid. Dr. Fullmer subsequently wrote a letter to Fremont explaining that Knowlton's initial diagnosis was an inhalation injury secondary to sulfuric acid exposure, but that the injury was mild or minor and would only be expected to last four to six weeks. He also explained that Knowlton likely reached maximum medical stability approximately six weeks after the exposure, and it was unlikely that her continued symptoms were directly related to the exposure. Rather, he believed her continued symptoms seemed more related to anxiety or a desire for a secondary gain related to the accident. Finally, he stated that he did not believe Knowlton had any significant physical impairment that was related to the industrial exposure.

Knowlton subsequently filed a complaint with the Industrial Commission, seeking reimbursement for her medical expenses and temporary total disability benefits. In the complaint, Knowlton named Wood River Medical Center[6] and Fremont as defendants, and alleged that her exposure to toxic sulfuric acid fumes on September 12, 2000, caused her to suffer a chronic cough, dyspnea, laryngitis, RADS, and laryngospasm. Knowlton filed an amended complaint on May 12, 2003, this time seeking additional workers' compensation benefits in the form of permanent partial impairment benefits and permanent partial disability benefits. In the amended complaint, Knowlton also added dysfunctional larynx and epigastric reflux to the list of medical problems allegedly caused by the chemical exposure.

Defense counsel subsequently filed an answer on behalf of Wood River, as well as Cambridge Integrated Services, the successor in interest to Fremont, which had gone bankrupt at some point after Knowlton's complaint was filed. As a result of Fremont's bankruptcy, the Idaho

---

[5] GERD is a condition that causes acid from the stomach to leak backwards to the esophagus, the larynx, and even the respiratory tract.

[6] At the time Knowlton filed her complaint, St. Luke's Regional Medical Center was in the process of purchasing Wood River Medical Center. Believing that the purchase had been completed, Knowlton originally named St. Luke's as the defendant. However, Knowlton filed an amended complaint on May 12, 2003, naming Wood River as the defendant.

4

Life and Health Insurance Guaranty Association (the Association)[7] was added as an interested party in the litigation.[8]

At some point in 2002, Knowlton was awarded social security disability benefits as a result of her continued symptoms. The Social Security Administration determined that Knowlton's allegations with regard to her medical symptoms were credible based on objective medical findings.

For the next several years, Knowlton continued to see Dr. Carveth. Dr. Carveth maintained her diagnosis of RADS and noted that Knowlton was expressing significant anxiety and depression related to her illness, as well as her sister's unexpected death in a car accident. Knowlton continued to develop additional symptoms related to an expanding list of triggers, including dust, pollen, animal dander, industrial chemicals used in farm machinery maintenance, marking pens, smoke, grooming products, and consumption of alcohol and many foods. Knowlton also underwent an esophagogastroduodenoscopy (EGD). The test results showed inflammation at Knowlton's gastroesphageal junction, which is consistent with GERD.

In September of 2005, Knowlton was examined by several of Respondents' experts, including toxicologist Dr. Stephen Munday, allergist Dr. William Wallace, and psychologist Dr. Craig Beaver. Dr. Munday concluded that Knowlton did not meet the criteria for a RADS diagnosis, and her symptoms were more likely the result of a GERD condition. Dr. Wallace conducted a skin panel, testing for approximately 80 to 90 of the most common allergens and 6 of the major foods for which Knowlton had reported experiencing a reaction. All of the tests came back negative. Dr. Beaver concluded that there was a correlation between stressful events in Knowlton's life and the development of her physical symptoms.

For reasons not relevant to this appeal, a hearing on the merits of Knowlton's claim did not occur until June of 2008. At the hearing, the Referee heard live testimony from Knowlton, as well as the Respondents' toxicology expert, Dr. Munday. In addition to this testimony, the depositions

---

[7] The Association is a non-profit association whose members are insurance companies licensed to write life, accident, and health/disability insurance policies in the State of Idaho. The Association was created after the Legislature passed the Idaho Life and Health Insurance Guaranty Association Act (the Act). In the event that a member insurer is determined to be insolvent and is ordered to be liquidated by a court, the Association provides protection (subject to the limits set forth in the Act) to residents of the state who have a covered insurance policy issued by the insolvent insurer. *See* title 41, chapter 36, Idaho Code.

[8] Wood River Medical Center, Fremont Compensation Insurance Company, and the Idaho Insurance Guaranty Association will collectively be referred to as Respondents.

of other witnesses, including several of Knowlton's family members, co-workers, and treating physicians, taken both before and after the hearing, were entered into the record. Each party submitted briefing on the matter at the close of the proceedings. Knowlton filed an opening brief and a reply brief, each totaling thirty pages. Respondents filed a motion to strike Knowlton's reply brief, arguing that Knowlton had failed to adhere to the page limitation set forth in the Commission's Judicial Rules of Practice and Procedure. The Referee denied the motion without commenting on the merits of Respondents' argument.

The Referee ultimately concluded that Knowlton had failed to demonstrate her medical symptoms were causally related to the chemical exposure she experienced on September 12, 2000, and that her symptoms were more consistent with GERD. Although the Referee determined Knowlton was not entitled to time loss benefits, or any form of disability benefits, the Referee did find that, because the medical treatment Knowlton received during the six weeks following the incident was a reasonable precautionary step taken in response to her exposure to an unknown chemical, she was entitled to compensation for those expenses.

The Commission adopted the Referee's findings of fact and conclusions of law. After the Commission denied Knowlton's motion for reconsideration, she timely appealed to this Court.

## II.
### Issues on Appeal

I.   Whether the Commission's conclusion that Knowlton failed to demonstrate her medical symptoms were causally related to the chemical exposure at her workplace is supported by substantial and competent evidence?

II.  Whether the Commission has jurisdiction to order the Idaho Insurance Guaranty Association to pay Knowlton workers' compensation benefits or attorney fees?

III. Whether the Referee erred by denying Respondents' motion to strike Knowlton's reply brief?

IV.  Whether the Commission abused its discretion by failing to award Knowlton attorney fees?

V.   Whether either party is entitled to attorney fees on appeal?

## III.
### Discussion

#### A.    Standard of Review

When reviewing a decision by the Industrial Commission, this Court exercises free review over the Commission's conclusions of law, but will not disturb the Commission's factual findings if they are supported by substantial and competent evidence. I.C. § 72-732; *Stewart v.*

6

*Sun Valley Co.*, 140 Idaho 381, 384, 94 P.3d 686, 689 (2004). Substantial and competent evidence is "relevant evidence which a reasonable mind might accept to support a conclusion." *Boise Orthopedic Clinic v. Idaho State Ins. Fund*, 128 Idaho 161, 164, 911 P.2d 754, 757 (1996). The Commission's conclusions regarding the credibility and weight of evidence will not be disturbed unless they are clearly erroneous. *Excell Constr., Inc. v. State, Dep't of Labor*, 141 Idaho 688, 692, 116 P.3d 18, 22 (2005). This Court will not re-weigh the evidence or consider whether it would have drawn a different conclusion from the evidence presented. *Id*.

### B.    Causation

On appeal, Knowlton argues that there is no evidence in the record to support the Commission's determination that her symptoms were likely caused by GERD. Rather, Knowlton asserts that the testimony of her treating physicians, the testimony of her family members, friends, and co-workers, and the medical records, including the results of her methacholine challenge tests,[9] all demonstrate that she contracted RADS as a result of the chemical exposure. Respondents, on the other hand, argue that the testimony of Dr. Munday, an expert in toxicology, and the testimony of Knowlton's treating physicians establish that Knowlton's symptoms were more consistent with GERD and could not have reasonably been caused by the chemical exposure.

A workers' compensation claimant has the burden of proving "to a reasonable degree of medical probability [that] the injury for which benefits are claimed is causally related to an accident occurring in the course of employment." *Wichterman v. J.H. Kelly, Inc*., 144 Idaho 138, 141, 158 P.3d 301, 304 (2007). "The issue of causation must be proved by expert medical testimony, although the Industrial Commission as the finder of fact may consider other evidence as well, including evidence regarding credibility." *Id.*

Although both parties presented testimony from numerous witnesses, the arguments in this case are largely based on the conflicting testimony of Knowlton's witness, Dr. Carveth, and Respondents' witness, Dr. Munday. Dr. Carveth testified that Knowlton developed RADS as a result of the chemical exposure, while Dr. Munday testified that Knowlton did not meet the criteria for a RADS diagnosis, and her symptoms were more likely the result of a GERD

---

[9] Methacholine challenge testing is one method of assessing airway responsiveness. Airway hyperresponsiveness is one of the features that may contribute to a diagnosis of asthma. During the test, the patient breaths in methacholine, which cause the airways to narrow. The degree of narrowing is then quantified.

condition. In concluding that Knowlton had failed to prove her medical symptoms were causally related to the chemical exposure, the Commission gave greater weight to Dr. Munday's opinion, and agreed that Knowlton's symptoms were more consistent with GERD than RADS. The Commission also found that this conclusion was supported by the testimony and reports of Dr. Fullmer and Dr. Beaver. Because this Court gives great deference to the Commission's conclusions regarding the credibility and weight of evidence, the only issue before this Court is whether the evidence relied on by the Commission constitutes substantial and competent evidence.

The testimony and reports of Dr. Munday, Dr. Beaver, and Dr. Fullmer constitute substantial and competent evidence supporting the Commission's conclusion that Knowlton did not meet her burden of proving her symptoms were casually related to the chemical exposure. First and foremost, the Commission's conclusion is supported by the testimony of Dr. Munday, who specializes in treating patients who have been exposed to toxic chemicals, including sulfuric acid. Dr. Munday, after reviewing Knowlton's medical records, reviewing the hearing exhibits, and personally examining Knowlton, specifically concluded that Knowlton's symptoms were not likely caused by chemical exposure but, rather, were likely a result of a GERD condition.

Dr. Munday's first basis for reaching this conclusion was that the symptoms Knowlton first reported having on the day of the exposure were not consistent with someone who had been exposed to sulfuric acid. According to Dr. Munday, sulfuric acid is a highly water soluble chemical that is going to first affect the nose, throat, eyes, and upper airway upon exposure. Dr. Munday also mentioned that sulfuric acid would cause a "high degree of irritation" to these areas. For this reason, Dr. Munday was concerned about the symptoms Knowlton described on the day of the exposure.

> There is not a description of eye burning and significant nasal burning which would be the first set of symptoms that would be anticipated and they would be so significant that you would expect somebody to actually leave the exposure if they were able to do so. So, I certainly agree that sulfuric acid is a respiratory irritant and under the right circumstances can cause respiratory damage or irritation. But it would be expected that the upper airways and mucous membranes would be affected first. That doesn't appear to the description of the events that occurred.

Therefore, because Knowlton reported developing a headache and a sore throat on the day of the exposure and did not similarly report any irritation in her eyes or any significant irritation with her nose, Dr. Munday concluded her initial symptoms were not consistent with exposure to

sulfuric acid.[10]

The Commission found Dr. Munday's report and testimony to be persuasive in this regard, pointing out that

> [t]he medical records nearest the exposure noted that [Knowlton's] most significant complaint was a cough. Referring to the day of the exposure, there is a passing reference to a burning sensation in [Knowlton's] nose but no mention of eye irritation. By context, if either her eyes or nasal passages had been significantly burned, there would likely be more prominent mention of it, and the examination would likely have revealed injury to those organs.

The second basis for Dr. Munday's conclusion was that Knowlton is the only employee or person who was present at the hospital on the day of the incident who claims to have suffered any sort of residual symptoms or effects from the chemical exposure. According to Dr. Munday, this further supports the conclusion that Knowlton's symptoms were not a result of exposure to sulfuric acid.

The final basis for Dr. Munday's conclusion was that Knowlton's medical symptoms were more consistent with GERD rather than exposure to a chemical such as sulfuric acid. Dr. Munday explained that GERD can cause asthma-like symptoms similar to those Knowlton suffers from. Specifically, Dr. Munday's report indicates that,

> [Knowlton] has multiple findings that support [a GERD] diagnosis in that: 1) she has symptoms consistent with gastroesphageal and laryngopharyngeal reflux disease in terms of her hoarseness, pain and respiratory complaints; 2) secondly, she notes that her dentist has noted that she appears to have some abnormalities secondary to acid etching of her teeth, which certainly can occur with reflux disease; 3) she had an upper gastrointenstinal endoscopy, which confirmed she had substantial evidence of inflammation at her gastroesophageal junction, once again consistent with gastroesphageal reflux disease.

Importantly, Knowlton was also diagnosed with severe GERD by Dr. Carveth.

Knowlton does not dispute the fact that she suffers from GERD. However, she argues the medical evidence demonstrates that she developed GERD after the chemical exposure, and as a result of suffering from RADS. In support of this argument, she cites to Dr. Carveth's testimony indicating that severe coughing episodes caused by RADS can lead to GERD. However, Dr. Munday specifically opined that Knowlton's GERD condition was not caused by the chemical exposure.

---

[10] Dr. Carveth also testified that the medical records did not indicate Knowlton had complained of any nose or eye irritation as a result of the exposure.

9

> I find it incredible that her treating pulmonologist, Dr. Carveth, at the University of Utah, notes in one place of her record that the patient never complained of reflux prior to the date of injury, at least, in my opinion, insinuating that the reflux would have been caused by this supposed exposure in the workplace. This is completely and patently scientifically unsupportable, and, in my opinion, the opposite is much more likely to be true; that since the patient has reflux and developed a sore throat, reflux would explain the acid taste, burning of her throat and subsequent development of her pulmonary symptoms.

In other words, Dr. Munday specifically reported that there is no medical evidence indicating that GERD is somehow caused by RADS.

Dr. Munday also thoroughly explained in his testimony and his report why he had concluded that Knowlton did not meet the criteria for a RADS diagnosis. The eight clinical criteria for diagnosing RADS include: (1) a documented absence of preceding respiratory complaints;[11] (2) the onset of symptoms occurred after a single specific exposure incident or accident; (3) the exposure to a gas, smoke, fume, or vapor which was present in very high concentration and had irritant qualities to its nature; (4) the onset of symptoms occurred within 24 hours after the exposure and persisted for three months; (5) symptoms simulated asthma with cough, wheezing and dyspenea; (6) pulmonary function tests may show airflow obstructions; (7) methacholine challenge test was positive; and (8) other types of pulmonary diseases were ruled out. Dr. Munday conceded that Knowlton developed symptoms immediately following the chemical exposure and that her symptoms persisted for more than three months, but disputed that the overall medical evidence, Knowlton's medical history, and Knowlton's symptoms indicated she was suffering from RADS.

First, Dr. Munday explained that patients generally do not develop RADS unless they have suffered "extensive high-dose exposure to highly irritating agents." He did mention that there has been some discussion in the medical community regarding whether low or intermediate doses could cause the syndrome, but explained that such a conclusion is controversial and not widely supported. For this reason, Dr. Munday found that the fact that Knowlton had not been

---

[11] Dr. Munday testified that this criterion has largely been abandoned and it is possible for a patient to develop RADS even if he or she has a preexisting respiratory condition. Although there is evidence in the record indicating that Knowlton was diagnosed with mild dyspnea by Dr. Fullmer in 1988, Knowlton, both at oral argument and in briefing, asserted that she was never treated for any respiratory condition prior to the incident. When addressing Dr. Fullmer's diagnosis of dyspnea in briefing, Knowlton explained that Dr. Fullmer's assessment "did not include any finding of asthma, and Dr. Fullmer ultimately concluded that Lesia Knowlton's physical condition was entirely normal."

10

exposed to a high dose of chemical,[12] militated against a RADS diagnosis.

Next, Dr. Munday also concluded that Knowlton was not suffering from RADS because she continued to have normal, or near-normal, pulmonary functioning tests. Dr. Munday testified that nearly all of the spirometry tests[13] produced normal results, and those that produced abnormal results were so near normal that they were unimportant. In fact, Dr. Munday explained that the normal breath ranges have recently been broadened and Knowlton's abnormal tests would now likely be classified as normal. Knowlton relies heavily on the results of the methacholine tests conducted by Dr. Fullmer and Dr. Carveth to support her argument that the Commission erred in concluding she had not demonstrated she was suffering from RADS as a result of the chemical exposure. The results of the methacholine tests showed a moderate degree of airway hyperresponsiveness. However, Dr. Munday testified that although this type of testing is an effective way to rule out asthma in a patient, positive results must be interpreted in the appropriate setting because false positives frequently occur.[14] He mentioned that ten to twenty percent of people have a positive result, even if they do not suffer from asthma. Dr. Munday also explained that the results of the methacholine tests were not helpful in determining causation because whether a person is experiencing respiratory problems as a result of allergies, RADS, or GERD, the tests do nothing to demonstrate which one is the cause.

Finally, Dr. Munday determined that many of Knowlton's symptoms were not attributable to RADS. Specifically, Dr. Munday explained that the vocal cord dysfunction, the odor-induced symptoms, and the subsequent development of allergic reactions to various foods were not characteristic of someone suffering from RADS. He opined that Knowlton's negative reaction to odors may be a result of psychosomatic odor intolerance. In reaching this conclusion, Dr. Munday found it important that all of Knowlton's allergy tests were negative. Dr. Munday also pointed out that there is no valid scientific evidence that would support an association between exposure to sulfuric acid and the subsequent development of an allergy to other sulfa-containing products. In other words, Knowlton's concern that she was developing an allergy to

---

[12] Dr. Fullmer agreed with Dr. Munday that Knowlton was likely only exposed to a low dose of chemical. "Patient describes an inhalation exposure with sulfuric acid at her workplace. I suspect it was a low concentration exposure, as sulfuric acid is quite irritating and if the concentration had been high then she would have been motivated to leave the area."

[13] Spirometry tests measure the amount and/or speed of air that can be inhaled and exhaled by a patient.

[14] Dr. Munday cited to the American Thoracic Society's "Guidelines for Methacholine and Exercise Challenge Testing," which explains the likelihood of false positive testing results.

foods containing sulfa as a result of the exposure to sulfuric acid is not medically supportable. As mentioned above, Dr. Munday testified that Knowlton's symptoms, especially the vocal cord dysfunction, were more consistent with GERD, and there is no medical evidence that GERD is somehow caused by RADS.[15]

The Commission's conclusion is also supported by the testimony of Dr. Fullmer and Dr. Beaver. Both Dr. Fullmer and Dr. Beaver testified that Knowlton's symptoms were likely attributable to her emotional distress rather than to the chemical exposure. Dr. Fullmer explained that, while Knowlton's initial diagnosis was an inhalation injury secondary to sulfuric acid exposure, the injury was mild or minor and would only be expected to last four to six weeks. He explained that he did not believe Knowlton suffered any significant physical impairment related to the exposure after the six-week mark, and that it was more likely that her symptoms were related to anxiety or a desire for secondary gain. Finally, he stated that he did not believe Knowlton had any significant physical impairment that was related to the industrial exposure. Similarly, Dr. Beaver concluded that there was a strong correlation between stressful events in Knowlton's life and the development of her physical symptoms. Although Dr. Beaver testified that he could not say that Knowlton did not have any respiratory difficulties, he did testify that there was a "conditioned relationship" between her emotional distress and her respiratory difficulties.

The testimony and reports of these medical professionals constitute substantial and competent evidence supporting the Commission's decision. In support of her argument that the Commission erred, Knowlton points to conflicting evidence and testimony in the record. However, this Court is not in the position to re-weigh evidence or determine whether it would have reached a different conclusion. Knowlton's main focus on appeal appears to be the temporal link between the chemical exposure and her medical symptoms. While the temporal connection certainly supports Knowlton's position, such a connection alone does not establish that her symptoms were *caused* by the chemical exposure. The medical evidence relied on by the Commission indicates that many of Knowlton's continued symptoms are inconsistent with a RADS diagnosis. Therefore, the Commission's determination that Knowlton did not meet her burden of proving her symptoms were related to the chemical exposure is supported by substantial and competent evidence.

---

[15] Dr. Munday mentioned an article in the Journal of the American Medical Association indicating that reflux is a major cause of laryngeal pathology.

Although the Commission's ultimate conclusion is supported by substantial and competent evidence in the record, its discussion regarding Knowlton's credibility is of some concern. The Referee made the following findings of fact with regard to Knowlton's credibility:

31. Claimant's testimony demonstrates she casually shifted from recalled fact to speculation without being aware she had done so. In her attempts to answer questions, it is impossible to separate actual memory from her supposed guesses at what might have happened.
32. Materially significant portions of her testimony were internally inconsistent among her 2003 deposition, her 2004 deposition, and her 2008 hearing testimony. This is not to say that Claimant deliberately lied. On the contrary, she appeared to attempt honesty at all times. However, over time, her memory has become so confabulated with the story of her illness that no part of her memory of these events or her symptoms can be accepted at face value.

These credibility findings were adopted by the Commission.

Determining the credibility of witnesses and evidence is a matter within the province of the Commission. *Stevens-McAtee v. Potlatch Corp.*, 145 Idaho 325, 331, 179 P.3d 288, 294 (2008). However, such findings are still subject to review by this Court. When analyzing the Commission's findings regarding credibility, this Court has bifurcated the issue into two categories, "observational credibility" and "substantive credibility." *Painter v. Potlatch Corp.*, 138 Idaho 309, 313, 63 P.3d 435, 439 (2003). Observational credibility "goes to the demeanor of the appellant on the witness stand and it requires that the Commission actually be present for the hearing in order to judge it." *Id.* In contrast, substantive credibility "may be judged on the grounds of numerous inaccuracies or conflicting facts and does not require the presence of the Commission at the hearing." *Id.* The Court will not disturb the Commission's findings regarding credibility if the findings are supported by substantial and competent evidence. *Id.*

In this case, it does not appear from the record that the Referee had any reason to doubt Knowlton's credibility. Knowlton's explanation of the events leading up to, and following, the incident on September 12, 2000, has been consistent. Although the Referee is correct that some details have been forgotten over the eight years leading up to the hearing, such is to be expected. However, the fact that Knowlton at times had difficulty remembering certain details does not support the Commission's conclusion that Knowlton's testimony could "not be accepted at face value." Interestingly, the Referee in this case is the same Referee that presided over the hearing in *Stevens-McAtee v. Potlatch Corp.* In that case, the Referee held that the claimant's testimony was not credible because the claimant "improved" or "enhanced" his testimony by adding

13

specific details at the hearing. *Stevens-McAtee*, 145 Idaho at 329, 179 P.3d at 292. On appeal, this Court found that the Referee's findings with regard to the claimant's credibility were not supported by substantial and competent evidence because, although there may have been slight differences or additions at the hearing, the claimant's testimony regarding how he was injured had remained consistent, and any differences in his testimony did not support the Referee's conclusion that he was not credible. *Id.* at 331, 179 P.3d at 294. Similarly in this case, the differences or additions in Knowlton's testimony over the eight years preceding the hearing does not support the Referee's conclusion that Knowlton was not credible. Therefore, the Commission's conclusions with regard to Knowlton's credibility are not supported by substantial and competent evidence, and this Court is not required to accept them on appeal. Nonetheless, because the issue of causation is dispositive on appeal and does not take into account the Referee's unsupported determination that Knowlton was not credible, this Court affirms the Commission's decision to deny Knowlton workers' compensation benefits, other than to cover the medical expenses incurred during the six weeks following the incident. Because we affirm the Commission's determination that Knowlton failed to meet her burden of proving her symptoms are causally related to the chemical exposure, it is unnecessary for us to consider the other issues raised by the Respondents on appeal, including whether the Commission has jurisdiction to order the Association to pay Knowlton workers' compensation benefits and whether the Commission erred in denying the Respondents' motion to strike.

## C.    Attorney Fees for the Proceedings Before the Commission

Knowlton argues that if this Court finds that the Commission erred in denying her claim, the Commission abused its discretion by failing to award her attorney fees incurred during the proceedings before the Commission pursuant to I.C. § 72-804. I.C. § 72-804 authorizes attorney fees to be paid to a claimant, where the employer or surety contests a claim for compensation without reasonable grounds to do so. I.C. § 72-804. Because there is substantial and competent evidence to support the Commission's decision, the Commission did not abuse its discretion in failing to award Knowlton attorney fees.

## D.    Attorney Fees on Appeal

Knowlton also contends that she is entitled to an award of attorney fees on appeal pursuant to I.C. § 72-804 and I.A.R. 41 because Respondents denied her claim and refused to pay benefits without reasonable grounds. Because we affirm the Commission's decision to deny

14

Knowlton's claim for additional workers' compensation benefits, Knowlton is not entitled to attorney fees on appeal.

Respondents request attorney fees on appeal pursuant to I.A.R. 41 and 11.2[16] on the ground that Knowlton frivolously pursued this appeal. I.A.R. 11.2 allows the Court to order a party, or a party's attorney, to pay attorney fees as a sanction for pursuing an appeal that is (1) not well grounded in fact; (2) not warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; or (3) was pursued for an improper purpose. Respondents argue that attorney fees are warranted because, on appeal, Knowlton has unreasonably sought to dispute the Commission's factual findings by pointing to irrelevant conflicts in the evidence. Although we affirm the Commission's ultimate conclusion, Knowlton's appeal was not frivolously pursued such that sanctions are warranted against either Knowlton or her counsel.

## IV.
### Conclusion

There is substantial and competent evidence in the record to support the Commission's conclusion that Knowlton failed to demonstrate her medical problems were causally related to the chemical exposure at Wood River Medical Center. Thus, this Court affirms the Commission's determination that Claimant is only entitled to workers' compensation benefits for the medical expenses incurred during the six weeks following the exposure. Costs, but no attorney fees, are awarded to Respondents.

Chief Justice EISMANN, and Justices BURDICK, W. JONES and HORTON CONCUR.

---

[16] In briefing, Respondents incorrectly cite I.A.R. 11.1 instead of 11.2 as a basis for attorney fees. This mistake seems to be a result of the fact that I.A.R. 11.2 was previously numbered as I.A.R. 11.1, and has just recently been renumbered. Respondents also cite *Keller v. Rogstad*, 112 Idaho 484, 733 P.2d 705 (1987), a case dealing with sanctions under this rule before the renumbering went into effect. Therefore, despite the citation error, it is clear what authority Respondents intended to provide in support of the request for attorney fees.