**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 45782**

| | |
|---|---|
| **BRYAN OLIVEROS,** ) | |
| ) | |
| **Claimant-Appellant,** ) | **Boise, January 2019 Term** |
| **vs.** ) | |
| ) | **Filed: March 28, 2019** |
| **RULE STEEL TANKS, INC., Employer,** ) | |
| **ADVANTAGE WORKERS** ) | **Karel A. Lehrman, Clerk** |
| **COMPENSATION** ) | |
| **INSURANCE CO., Surety,** ) | |
| ) | |
| **Defendants-Respondents.** ) | |
| _____ ) | |

Appeal from the Industrial Commission of the State of Idaho.

The decision of the Commission is <u>affirmed</u>. Costs are <u>awarded </u>to Respondent.

W. Breck Seiniger, Jr., Boise, attorney for Appellant.

R. Daniel Bowen Boise, attorney for Respondent.

_____

BEVAN, Justice

## I. NATURE OF THE CASE

This is a worker's compensation case. Bryan Oliveros filed a complaint with the Idaho Industrial Commission ("Commission") after he was involved in a work related accident at Rule Steel Tanks, Inc. ("Rule Steel"). The accident resulted in the partial amputation of all four fingers on his dominant hand. The Commission awarded Oliveros compensation for a 32% partial permanent impairment ("PPI") rating but declined to award any additional benefits after it later found his permanent partial disability ("PPD") rating to be 25%. Oliveros appealed to this Court. While we conclude the Commission erred when it found Oliveros' PPI could exceed his PPD, we otherwise affirm the Commission's decision.

## II. FACTUAL AND PROCEDURAL BACKGROUND

1

## A. FACTUAL BACKGROUND

In 2008, before starting his senior year of high school, Oliveros had a summer job with Rule Steel operating a metal press that shaped pieces of steel. Oliveros earned about $7 an hour. On July 30, 2008, his second day at work, the fingers of Oliveros' dominant, right hand were caught in the metal press, which resulted in the traumatic amputation of portions of all four fingers, associated crush injuries, and some degloving injuries on what remained of his fingers. Oliveros had approximately five surgeries before he was considered medically stable. On April 6, 2009, Oliveros' treating physician, Dr. Gross, found that Oliveros had suffered a 32% PPI rating due to his injuries. Dr. Gross released Oliveros to his pre-injury occupation with these restrictions:

> He may work in an 8-10 hour shift, with usual and customary breaks, at a medium duty position. The following restrictions are for his Right Upper Extremity Only:
> 5 pound grip/carry
> 75 pound push
> 50 pound pull
> 20 pound lifting
> No fine manipulation
> Mr. Oliveros should be able to comply with these restrictions for the full shift, without special breaks or rest periods, based on the findings of the [Functional Capacity Evaluation].

Prior to his accident Oliveros had several jobs predominantly in the fast food industry. In either 2006 or 2007, Oliveros worked for Burger King for about 6 months. In April 2008, Oliveros worked as a cashier at Dairy Queen. Following the accident, around March 2009, Oliveros returned to work at Dairy Queen for a few months performing light duty work running the cashier stand and cleaning tables.

Oliveros went back to high school in 2009; however, after missing too much school while recovering from his accident, he ultimately obtained his GED from Boise State University in 2010. From August 2010 to April 2011, Oliveros attended Lewis-Clark State College in Lewiston, Idaho, where he took business classes for two semesters. The summer of 2011, Oliveros took an online class in communications at College of Western Idaho ("CWI"). From August to December 2011, Oliveros returned to the Nampa/Boise area and began working in customer service for WDS Global, a Verizon call center, earning around $9 or $10 an hour with benefits.

2

Oliveros decided to pursue a career as a pharmacy technician. In 2012, Oliveros enrolled in Carrington College to become certified as a pharmacy technician; however, he dropped out after a few months. From approximately September 2012 to May 2013, Oliveros took courses from the Milan Institute where he earned a Certificate of Completion in Pharmacy Technology. Oliveros went on to work at the Terry Reilly Pharmacy with a provisional license as a pharmacy technician in training. Oliveros earned an initial wage of about $13 an hour that eventually increased to $13.80 an hour. Oliveros left Terry Reilly in August 2015 after he could not pass the examination to become a full pharmacy technician.

From August to September 2015, Oliveros worked at Medcap Pharmacy making about $14 an hour. From September to November 2015, Oliveros worked at TigerDirect as an account manager, making $14.42 an hour plus commissions. From November 15, 2015, to February 29, 2016, Oliveros applied for pharmacy jobs at Walgreens, Walmart, and Albertsons but was not hired. On February 29, 2016, Oliveros started working for KeyBank as a bank teller, making $11.75 an hour plus benefits he could purchase. Oliveros worked at Key Bank for about 8 months until he was let go because of a customer complaint.

On December 5, 2016, Oliveros began working as a third-party coordinator for Albertsons' corporate office. Oliveros remained employed at Albertsons at the time of his hearing, earning $15.87 per hour, plus benefits.

### B. PROCEDURAL BACKGROUND

On February 16, 2010, Oliveros filed a worker's compensation complaint with the Commission seeking: (1) medical benefits; (2) total temporary disability ("TTD")/total permanent disability ("TPD"); (3) permanent partial impairment ("PPI"); (4) permanent partial disability ("PPD"); (5) retraining; and (6) attorney fees. Rule Steel conceded Oliveros suffered a 32% PPI rating, which it had already paid him; however, Rule Steel disputed whether Oliveros: (1) was entitled to payment for his PPD rating beyond the award he received for his 32% PPI rating; (2) needed retraining benefits to restore his wage earning capacity; (3) required even more medical treatment; and (4) needed prostheses.

The parties stipulated to a limited hearing held on December 7, 2011, to determine whether Oliveros was entitled to prosthetic fingers under Idaho Code section 72-432. Oliveros argued that prosthetic silicone fingers were a reasonable part of the medical care necessitated by his injury, whereas Rule Steel argued that prosthetic fingers were not medically necessary

3

because they would not improve the residual function of Oliveros' hand. On November 2, 2012, the Commission denied Oliveros' request for prosthetics. The Commission was persuaded by the testimony of Dr. Gross, Oliveros' treating physician, who opined that prostheses would be useless and would contribute to an even greater loss of function. Oliveros filed a motion for reconsideration and motion to rehear the case en banc, which the Commission denied on December 14, 2012.[1]

No further action was taken in the case until February 21, 2017, when Oliveros filed a prehearing statement for his remaining claims. Oliveros mainly relied on a report prepared by Douglas Crum, a vocational expert Oliveros retained at his own expense in 2009. Mr. Crum suggested that the only way Oliveros could successfully mitigate the effects of his 2008 accident would be through education. Mr. Crum opined that "[w]ithout retraining . . . Mr. Oliveros would reasonably experience disability, inclusive of impairment, of approximately 75%." On April 7, 2016, Mr. Crum updated his report based on Oliveros' more recent education and work history and stated that because of Oliveros' "retraining" he had not suffered a loss of wage earning capacity, but he had a 55% loss of labor market access, resulting in a PPD rating of 45%.

A hearing was held on February 22, 2017, to determine whether Oliveros had a right to retraining reimbursement benefits, temporary disability benefits while he was retraining, PPD, and attorney fees. Oliveros limited the retraining benefits he sought to reimbursement for the Milan Institute program. Oliveros argued that because he reduced his PPD rating at his own expense he was entitled to compensation for the retraining he underwent. Alternatively, Oliveros argued that if Rule Steel did not have to pay for his retraining they should not benefit from his self-funded education and be required to pay his PPD at the higher rate of 75%.

On July 27, 2017, the Referee entered findings of fact and conclusions of law that determined that Oliveros was not entitled to additional compensation because he failed to prove that: (1) he was entitled to reimbursement and corresponding TTD benefits under Idaho Code section 72-450; or that (2) he was entitled to additional PPD benefits above the 32% PPI benefits previously paid. On August 25, 2017, the Commission adopted the Referee's findings. On

---

[1] In his opening brief, Oliveros initially raised the issue of whether the Commission erred when it determined that Oliveros was not entitled to prostheses; however, after Rule Steel expressed concerns regarding the timeliness of the issue, Oliveros withdrew it from his appeal. While the time to file an appeal would have begun on the date the Commission denied Oliveros' motion for reconsideration—December 14, 2012—no further action was taken in the case until February 21, 2017; as such, Oliveros' appeal concerning the prosthetics issue is time-barred.

September 14, 2017, Oliveros filed a motion for reconsideration, which the Commission denied. Oliveros timely appealed to this Court.

### III. ISSUES ON APPEAL

1. Whether the Commission erred when it declined to award Oliveros PPD benefits in addition to PPI benefits.

2. Whether the Commission erred when it determined that Oliveros suffered a 25% PPD rating.

3. Whether the Commission's decision to deny Oliveros' request for retraining benefits under Idaho Code section 72-450 is supported by substantial and competent evidence.

4. Whether either party is entitled to attorney fees on appeal.

### IV. STANDARD OF REVIEW

"When reviewing a decision by the Industrial Commission, this Court exercises free review over the Commission's conclusions of law, but will not disturb the Commission's factual findings if they are supported by substantial and competent evidence." *Knowlton v. Wood River Med. Ctr.*, 151 Idaho 135, 140, 254 P.3d 36, 41 (2011) (citing I.C. § 72–732). "Substantial and competent evidence is relevant evidence that a reasonable mind might accept to support a conclusion." *Mazzone v. Texas Roadhouse, Inc.*, 154 Idaho 750, 755, 302 P.3d 718, 723 (2013).

*Jordan v. Dean Foods*, 160 Idaho 794, 798, 379 P.3d 1064, 1068 (2016). "Because the Commission is the fact finder, its conclusions on the credibility and weight of the evidence will not be disturbed on appeal unless they are clearly erroneous." *Funes v. Aardema Dairy*, 150 Idaho 7, 10, 244 P.3d 151, 154 (2010) (quoting *Eacret v. Clearwater Forest Indus.*, 136 Idaho 733, 735, 40 P.3d 91, 93 (2002). "Whether a claimant has an impairment and the degree of permanent disability resulting from an industrial injury are questions of fact." *Id*.

### V. ANALYSIS

**A. The Commission properly concluded that Oliveros was not entitled to a separate award for his PPD and his PPI.**

Oliveros was awarded benefits for his 32% PPI rating after he was considered medically stable. Several years later, the Commission found that Oliveros suffered a 25% PPD rating but declined to award any additional benefits. The Commission held that the 25% whole person PPD rating was subsumed within the 32% PPI payment Oliveros already received. On appeal, Oliveros argues that the Commission erred by declining to award him disability benefits in addition to the impairment benefits he was initially awarded.

5

Title 72 of the Idaho Code governs worker's compensation law. I.C. § 72-101. The terms "permanent impairment" and "permanent disability" are both defined by statute.

"Permanent impairment" is defined as

> any anatomic or functional abnormality or loss after maximal medical rehabilitation has been achieved and which abnormality or loss, medically, is considered stable or nonprogressive at the time of evaluation. Permanent impairment is a basic consideration in the evaluation of permanent disability, and is a contributing factor to, but not necessarily an indication of, the entire extent of permanent disability.

I.C. § 72-422. The evaluation of permanent impairment is a medical assessment of the nature and extent of the injury as it affects the injured employee's daily living, i.e., self-care, communication, normal living postures, ambulation, elevation, traveling, and nonspecialized activities of bodily members. I.C. § 72-424. The permanent impairment rating is one component to be considered by the Commission, but is not the exclusive factor, in determining a claimant's permanent disability rating. *Baldner v. Bennett's, Inc.*, 103 Idaho 458, 461, 649 P.2d 1214, 1217 (1982).

"Permanent disability" occurs "when the actual or presumed ability to engage in gainful activity is reduced or absent because of permanent impairment and no fundamental or marked change in the future can be reasonably expected." I.C. § 72-423. The evaluation of permanent disability is an assessment of the employee's present and future probability to engage in gainful activity as it is affected by the medical factor of permanent impairment and by pertinent nonmedical factors identified in section 72-430. I.C. § 72-425. Such nonmedical factors include:

> (1) the nature of the physical disablement; (2) the disfigurement if of a kind likely to limit the employee in procuring or holding employment; (3) the cumulative effect of multiple injuries; (4) the occupation of the employee; (5) and his age at the time of accident causing the injury, or manifestation of the occupational disease, consideration being given to the diminished ability of the afflicted employee to compete in an open labor market within a reasonable geographical area considering all the personal and economic circumstances of the employee; and (6) other factors as the commission may deem relevant . . . .

I.C. § 72-430.

Oliveros relies on two recent Idaho Supreme Court cases, *Corgatelli v. Steel West, Inc.*, 157 Idaho 287, 335 P.3d 1150 (2014), and *Davis v. Hammock Management*, 161 Idaho 791, 391 P.3d 1261 (2017), to argue he was entitled to both PPI benefits as well as PPD benefits. In *Corgatelli*, this Court held that the Commission erred when it allowed an employer to offset its

6

liability for an employee's total and permanent disability ("TPD") benefits with a credit for the permanent physical impairment benefits previously paid to its employee. 157 Idaho at 292, 335 P.3d at 1155. We applied this same principle in *Davis*, and held that such credits to employers were invalid in the context of TPD benefits. 161 Idaho at 796, 391 P.3d at 1266.

While we find *Corgatelli* and *Davis* to be factually distinguishable because those claimants both received TPD benefits under section 72-408, whereas Oliveros received PPD benefits under section 72-428[2], this distinction does not change the legal outcome because there is no "impairment award" under Idaho's Worker's Compensation Act. With that said, we disavow those statements in *Corgatelli* and *Davis* that suggest an injured worker is entitled to recover both "impairment" and "disability" benefits under the Act. Namely, this Court's assertion in *Corgatelli* that "[a]lthough partial permanent disability benefits are calculated in relation to permanent physical impairment benefits, Idaho Code sections 72-427 to -429, partial permanent disability benefits and permanent physical impairment benefits are two separate forms of compensation." 157 Idaho at 292, 335 P.3d at 1155. The confusion may have arisen from our recognition in the past that

> [i]n worker's compensation cases, the claimant's recovery is typically categorized into types of benefits, such as medical expenses, temporary disability, permanent impairment, and permanent disability (disability in excess of impairment). Because those benefits are determined separately, the claimant's recovery for each type of benefit is an identifiable sum of money.

*Seiniger Law Offices, P.A. v. State ex rel. Indus. Comm'n*, 154 Idaho 461, 466, 299 P.3d 773, 778 (2013). We now clarify that even though multiple payments may be made for different types of benefits in these cases, payments made for partial impairment are subsumed by, and part of, the final disability award. Indeed, while impairment and disability are separately defined under the Worker's Compensation Act, there is no separate statutory mechanism authorizing separate awards for income benefits based on a claimant's PPI and his PPD ratings. Instead, any monies paid based on impairment are in actuality payments for disability. Any payments or awards made before the final disability award are therefore more-accurately characterized as disability payments under the statute.

---

[2] The Commission initially identified Oliveros' award as an award for "impairment benefits." However, impairment is only payable as a component of disability; thus, it is more accurate to characterize Oliveros' award as an award for PPD benefits.

We recently recognized this principle in *Mayer v. TPC Holdings, Inc.,* in which we noted:

> Although the term "impairment award" has crept into the vernacular of the workmen's compensation bar, Idaho's Workmen's Compensation Law only provides for an award of income benefits based on disability, not impairment. *Fowler v. City of Rexburg*, 116 Idaho 1, 3 n.5, 773 P.2d 269, 271 n.5 (1988) ("Income benefits payable under the Workmen's Compensation Law, with the exception of retraining benefits, I.C. § 72–450, are based upon disability, either temporary or permanent, but not merely impairment."). A "permanent impairment" as the definitions themselves make clear, is simply a component of a "permanent disability." I.C. §§ 72-422, -423. Thus, any final award made under Idaho's Workmen's Compensation Law is properly referred to as a disability award. *Fowler*, 116 Idaho at 3 n.5, 773 P.2d at 271 n.5 ("While in some cases the non-medical factors will not increase the permanent disability rating over the amount of the permanent impairment rating, the ultimate award of income benefits is based upon the permanent disability rating, not merely the impairment rating."); *see also Woodvine v. Triangle Dairy*, 106 Idaho 716, 722, 682 P.2d 1263, 1269 (1984).

160 Idaho 223 n.1, 370 P.3d 738 n.1 (2016).

Thus, we take this opportunity to reiterate that Idaho's workers compensation law only provides for an award of income benefits based on disability, not impairment. *See id.* There are not separate income awards for PPI and PPD[3]. Instead, monies received by the claimant for PPI are part of his final award for PPD. This accords with how disability is calculated, e.g., PPI is one component to be considered by the Commission, but is not the exclusive factor, in determining a claimant's PPD rating. *Baldner*, 103 Idaho at 461, 649 P.2d at 1217. We hold that the Commission did not err in following *Mayer* and identifying that there is not a separate avenue for recovery of both impairment and disability because impairment is included in the determination of disability. *Corgatelli* and *Davis*, *supra*, are overruled insofar as they are inconsistent with this opinion.

**B.      The Commission erred when it determined that Oliveros' PPD rating was lower than his impairment rating. Nevertheless, its conclusion is affirmed.**

Oliveros also argues that the Commission's determination that he had a 25% PPD rating was speculative. In proceedings before the Commission, Oliveros retained Mr. Crum as a vocational expert. Mr. Crum came up with a retraining plan based on Oliveros' medical records,

---

[3] The parties may enter into a contract for payment of monies based on PPI while reserving the right to seek additional monies for PPD. *See Woodvine v. Triangle Dairy, Inc*., 106 Idaho 716, 722, 682 P.2d 1263, 1269 (1984). There is nothing in the record before us to establish that the parties made any such agreement regarding Oliveros' award for 32% PPI.

restrictions given by Dr. Gross, Oliveros' work history, and his access to the labor market both pre- and post-injury. Oliveros asserts that the Commission arbitrarily rejected Mr. Crum's testimony about the extent of Oliveros' disability. Oliveros also points out that Rule Steel retained, but did not utilize, a vocational expert; as such, Mr. Crum's testimony was unrebutted.

"A determination by the Commission as to the degree of permanent disability resulting from an industrial injury is a factual question committed to the particular expertise of the Commission." *McCabe v. Jo Ann Stores, Inc.*, 145 Idaho 91, 99, 175 P.3d 780, 788 (2007) (internal citation omitted). Such findings are much like those made by a trial court, so the following analysis equally applies to the findings of the Commission:

> A trial court's findings of fact will not be set aside on appeal unless they are clearly erroneous. When deciding whether findings of fact are clearly erroneous, this Court does not substitute its view of the facts for that of the trial court. It is the province of the trial court to weigh conflicting evidence and to judge the credibility of witnesses. On appeal, this Court examines the record to see if challenged findings of fact are supported by substantial and competent evidence. Evidence is regarded as substantial if a reasonable trier of fact would accept it and rely upon it in determining whether a disputed point of fact has been proven.

*Miller v. Callear*, 140 Idaho 213, 216, 91 P.3d 1117, 1120 (2004) (internal citations omitted). "The opinion of an expert is not binding on the trial court, and, as long as it does not act arbitrarily, the trial court may reject expert testimony even when it is uncontradicted." *Id*. at 218, 91 P.3d at 1122 (citing *Levin v. Levin*, 122 Idaho 583, 836 P.2d 529 (1992)).

As set forth in Section A, a claimant's disability rating is based on his or her "present and probable future ability to engage in gainful activity." I.C. § 72-425. This Court has held "[t]he word 'present' implies that the Commission is to consider the claimant's ability to work as of the time the evidence is received. There is no 'present' opportunity for the Commission to make its determination apart from the time of hearing." *Brown v. Home Depot*, 152 Idaho 605, 609, 272 P.3d 577, 581 (2012). At the time of Oliveros' hearing, the Commission found that he suffered a 25% PPD rating. The Commission found that Mr. Crum's opinions were of little advisory benefit because: (1) other than stating that jobs such as medical doctors or lawyers were not considered when calculating Oliveros' loss of potential jobs, Mr. Crum failed to identify what categories of jobs were included; (2) his report was conclusory in nature; and (3) the report implied that Oliveros would have a difficult time finding employment, making more than minimum wage,

9

and escaping poverty, when in reality Oliveros had always been able to find a job within a reasonable time and he has found employment for jobs earning greater than minimum wage.

The Commission also recognized that Mr. Crum failed to highlight Oliveros' many assets when preparing his analysis. Oliveros is fluent in Spanish and English, both spoken and written. He is good at math and has significant skills with basic computer programs used in business, including spreadsheets, Photoshop, and Word. He took advanced computer classes in high school including business applications and principles of marketing. He had a strong interest in business, and enjoyed his business classes. He had no impediments to employment before his accident, nor did he have a criminal record. Further, the Commission appropriately recognized that Oliveros had no desire to do many jobs that his injury precluded him from pursuing. Instead, he consistently testified that he had always intended to pursue higher education. Ultimately, the Commission determined that because of Oliveros' choice of career opportunities, he minimized the effect of his disability, and considering the totality of the evidence, the Commission found Oliveros' PPD rating to be 25%. The Commission rejected Mr. Crum's assertion that Oliveros' hand injury would severely impact his vocational options for the rest of his life, calling it "vastly overstated" due to Oliveros' drive, desire, adaptability, and perseverance.

"A determination by the Commission as to the degree of permanent disability resulting from an industrial injury is a factual question committed to the particular expertise of the Commission." *McCabe*, 145 Idaho at 99, 175 P.3d at 788. "The Court cannot re-weigh the evidence or consider whether it would have drawn a different conclusion from the evidence presented unless it is clearly erroneous." *Id*. There is no indication that the Commission acted arbitrarily in rejecting Mr. Crum's testimony. Oliveros has always been able to find a job within a reasonable time, found employment for jobs greater than minimum wage, and now has a job with Albertsons, which is a career opportunity.

With that said, the Commission erred in concluding that Oliveros' PPD rating was lower than his PPI rating. The primary purpose of an award of permanent disability is to compensate the claimant for a reduction in the claimant's capacity for gainful activity. *Graybill v. Swift & Co.*, 115 Idaho 293, 294, 766 P.2d 763, 764 (1988) (citing I.C. § 72-425). The test for determining whether a claimant has suffered a permanent disability greater than permanent impairment is "whether the physical impairment, *taken in conjunction with non-medical factors*, has reduced the claimant's capacity for gainful activity." *Id*. (emphasis added). Under this test it

is feasible that a PPD rating may exceed the claimant's PPI rating; however, because the impairment is part of the calculation for disability, once a PPI disability rating has been set, a PPD rating cannot be lower than such a rating. The PPI rating is a *permanent* rating of impairment. Such a rating sets the floor from which a disability rating may only increase, based on the factors in Idaho Code section 72-430. The Commission erred in concluding that Oliveros suffered a PPD rating lower than his PPI rating.

Even so, we have already clarified that a claimant does not receive separate awards for PPI and PPD. As a result, the Commission's reduced PPD rating, although erroneous, is in reality a finding that Oliveros established no disability in excess of impairment. We therefore affirm the Commission's decision.

**C.      The Commission's decision to deny Oliveros' request for retraining benefits under Idaho Code section 72-450 is supported by substantial and competent evidence.**

Mr. Crum testified that Oliveros' future employment opportunities—particularly his ability to pursue high-paying manual labor jobs—would be limited by his accident because he no longer had the manual dexterity to do those kinds of jobs. Mr. Crum opined that the only way Oliveros could successfully mitigate the effects of his accident would be through education. Following the accident, Oliveros obtained his GED and went on to earn a Certificate of Completion in Pharmacy Technology. It is undisputed that through Oliveros' post-accident education and employment-related activities he improved his access to the labor market. The question is whether Rule Steel should have to reimburse Oliveros for the expenses associated with his education under Idaho Code section 72-450. In the alternative, Oliveros asserts the Commission should have evaluated his disability and arrived at his PPD rating without considering his education.

Idaho Code section 72-450 provides:

> Following a hearing upon a motion of the employer, the employee, or the commission, if the commission deems a permanently disabled employee, after the period of recovery, is receptive to and in need of retraining in another field, skill or vocation in order to restore his earning capacity, the commission may authorize or order such retraining and during the period of retraining or any extension thereof, the employer shall continue to pay the disabled employee, as a subsistence benefit, temporary total or temporary partial disability benefits as the case may be. The period of retraining shall be fixed by the commission but shall not exceed fifty-two (52) weeks unless the commission, following application and hearing, deems it advisable to extend the period of retraining, in which case the

11

increased period shall not exceed fifty-two (52) weeks. An employer and employee may mutually agree to a retraining program without the necessity of a hearing before the commission.

In short, section 72-450 gives the Commission discretion to authorize retraining benefits if it determines a permanently disabled employee is receptive to, and in need of, retraining in another field, skill, or vocation to restore his earning capacity. I.C. § 72-450. A claimant's ability to restore earning capacity after suffering an injury is not limited to a comparison of wages, but also depends on relevant factors such as a claimant's willingness to work, attitude, and particular skillset. I.C. § 72-102(34) ("wage-earning capacity shall be determined in the light of all factors and circumstances which may affect the worker's capacity to earn wages.").

The Commission determined that Idaho Code section 72-450 did not apply because Oliveros did not have an established field, skill, or vocation at the time of his accident from which he was precluded because of his injuries. Oliveros contends the implications of this interpretation preclude recovery for unskilled and minor workers. That said, the Commission appropriately recognized that Oliveros' one plus-day's experience at Rule Steel did not imbue him with skills, was not his chosen field, and was never considered by him to be a place where he intended to pursue his life's vocation. The point of retraining is to *restore* a claimant's earning capacity. I.C. § 72-450. It stands to reason that an earning capacity would need to be established and damaged before it can be restored.

Oliveros contends that even if he was required to have such an established field, skill, or vocation, the Commission erred in holding that his work at fast-food restaurants was insufficient under section 72-450 to establish a basis for retraining. However, this argument ignores the fact that Oliveros could, and did return to work in the fast food industry, at least temporarily. In doing so, Oliveros demonstrated he maintained the ability to work in a fast food restaurant without requiring retraining. Oliveros cites testimony given at the hearing to argue the Commission's conclusion was not based on substantial evidence, but the testimony merely showed that Oliveros was learning how to use his left hand instead of his right shortly after the accident. There is no suggestion from his testimony that Oliveros left Dairy Queen because he was unable to do the job. The Commission could have reasonably concluded that Oliveros had proven he was able to continue working in fast food, but left to pursue other options, such as to complete his GED and attend college.

12

Indeed, Oliveros testified that before the accident and injury his intention was to finish high school and go to college. Oliveros made the decision to pursue a career as a pharmacy technician based on his own research and conversations with relatives who worked in that industry. Oliveros also testified that he did not seek any retraining assistance when he attended the Milan Institute:

> Q. So that isn't something you presented to them?
>
> A. No. I mean, it's something that I, personally, you know made a decision about. I didn't have time to wait for people to help me with, you know - - to get money from other people, to help me with my education.
>
> Q. You were capable of moving on with your life?
>
> A. Correct.
>
> Q. And you wanted to move forward and get that done?
>
> A. Correct.

Despite Oliveros' testimony unequivocally showing that his intentions were always to pursue additional education following high school, Oliveros contends the Commission abused its discretion in denying his request for retraining benefits. However, while the Commission can authorize retraining, there is no requirement that it do so. Retraining is appropriate in circumstances where an injured worker needs retraining due to the loss of a skill as a result of an industrial accident. This case presents a unique situation, but the Commission did not err in recognizing that Oliveros intended to continue his education after high school before his accident, and nothing in the record shows that "but for" the accident, Oliveros would have chosen a different path.

Alternatively, Oliveros asserts that Rule Steel should not be able to reap the benefits of his self-funded education and the Commission should have determined his PPD rating without factoring in his education. Even so, we have already established the appropriate time for the Commission to make a determination on a claimant's "present and probable future ability to engage in gainful activity" is at the time of the hearing. *Brown*, 152 Idaho at 609, 272 P.3d at 581. At the time of his hearing, Oliveros had already successfully earned a Certificate of Completion in Pharmacy Technology from the Milan Institute and demonstrated he could obtain steady employment. The Commission cannot speculate about what could have happened if Oliveros had sat by the sideline rather than pursue new employment opportunities after his accident. The Commission commended Oliveros for his drive and ability to move forward with

his life. Even so, the Commission recognized that Oliveros' perseverance did not mean that Rule Steel had to retroactively assume that financial responsibility. The Commission's finding that Oliveros failed to prove he was entitled to reimbursement under Idaho Code section 72-450 is supported by substantial and competent evidence.

**D.      No attorney fees on appeal.**

Oliveros requests attorney fees on appeal under Idaho Appellate Rule 41 and Idaho Code section 72-804. Rule Steel requests attorney fees and costs under Idaho Code section 12-121, I.R.C.P. 54(d) and 54(e), Idaho Appellate Rule 41, and all other applicable state law. While we find Rule Steel to be the prevailing party, its reliance on Idaho Code section 12-121 is misplaced because it does not apply to worker's compensation appeals. *Clark v. Shari's Mgmt. Corp.*, 155 Idaho 576, 583, 314 P.3d 631, 638 (2013) ("I.C. § 12-121, does not apply to this appeal because worker's compensation cases are not civil actions."). Rule Steel has also requested attorney fees under "all other applicable state law" but failed to provide any specific authority that would permit recovery of attorney fees. "In order to be awarded attorney fees, a party must actually assert the specific statute or common law rule on which an award is based. . . ." *Browning v. Browning*, 136 Idaho 691, 696, 39 P.3d 631, 636 (2001) (quoting *Bingham v. Montane Resource Associates*, 133 Idaho 420, 427, 987 P.2d 1035, 1042 (1999). As a result, we decline to award attorney fees on appeal.

## VI. CONCLUSION

The Commission's decision is affirmed. Costs, but not attorney fees, are awarded to Rule Steel.

Chief Justice BURDICK, Justices BRODY, STEGNER and MOELLER CONCUR.

14