786 P.2d 557

**Robert ARCHER, Claimant–Respondent,**

v.

**BONNERS FERRY DATSUN, Employer, and Universal Underwriters Insurance Company, Surety, Defendants–Appellants,**

and

**State of Idaho, Industrial Special Indemnity Fund, Defendant–Appellant.**

Nos. 17184, 17204.

Supreme Court of Idaho.

Jan. 31, 1990.

Coughlan, Coughlan & Korn, Boise, for appellants Bonners Ferry Datsun and Universal Underwriters Ins. Co., Glenn A. Coughlan, argued.

Elsaesser, Jarzabek, & Buchanan, Sandpoint, for respondent, Robert Archer. Joseph Edward Jarzabek, argued.

Jim Jones, Atty. Gen., and Skinner, Fawcett & Mauk, Boise, for respondent, State of Idaho, Indus. Sp. Indem. Fund. William L. Mauk, argued.

Clements, Brown & McNichols, Lewiston, for amicus, Workers' Compensation Exchange. Michael E. McNichols, argued.

Penland & Munther, Boise, for amicus Idaho Employers Council. Paul S. Penland, argued.

The Previous Opinion Issued December 15, 1988, is Hereby Withdrawn and this Opinion is Substituted Therefor.

## ON REHEARING

JOHNSON, Justice.

This is a worker's compensation case. The primary issue presented in this appeal is whether there was substantial competent evidence to support the finding of the Industrial Commission that the claimant (Archer) was totally and permanently disabled under the odd-lot doctrine. The Industrial Special Indemnity Fund (ISIF) also contests the apportionment of compensation for fifty percent of Archer's disability to ISIF. We affirm the decision of the Commission on each of these issues. We reverse the Commission's award of attorney fees to Archer from the employer and remand this portion of the case to the Commission for further consideration.

### I.

### THE BACKGROUND AND PRIOR PROCEEDINGS.

Archer injured his left knee in 1976 while working in California. As a result of this injury, he wore a brace on his left knee beginning in 1980. In 1983, while working for Bonners Ferry Datsun (the employer), Archer injured his right knee. Surgery was performed, and the condition of his right knee became permanent and stationary by September 1984. The employer's surety paid Archer temporary total disability benefits in 1983 and 1984 and permanent partial disability benefits in 1984 and 1985. These payments were terminated in December 1985.

Hearings were held before the Commission in 1985 to determine the degree of Archer's permanent disability and the respective responsibilities of the employer and ISIF for further compensation. In August 1986 the Commission awarded Archer temporary total disability benefits from the employer for his right knee injury. The Commission found that Archer was unemployable in the area where he lived, and that if retraining could be arranged, he would be cooperative and would accept retraining. The Commission found that Archer was entitled to fifty-two weeks of retraining benefits, including relocation costs, and held in abeyance a determination of his permanent physical impairment and permanent disability until the retraining was completed. The Commission also awarded Archer attorney fees of thirty-three and one-third percent of all compensation paid or to be paid.

In December 1986, pursuant to a motion for reconsideration by the employer, the Commission issued a new decision reaffirming its prior decision. In this new decision the Commission stated that the parties had stipulated and agreed for Archer to obtain retraining at North Seattle Community College commencing in January 1987. The Commission also awarded Archer $10,000 attorney fees from the employer's surety and ISIF based on their agreement. Archer then sought a writ of prohibition from this Court contending that he had not agreed to relocate for retraining and asking this Court to prohibit the Commission from enforcing its decision of December 1986. Before a decision was made on Archer's request for a writ of prohibition, the Commission issued a new decision giving Archer the option to pursue retraining either at North Seattle Community College or at North Idaho College, so that he would not have to relocate out of Idaho. In this decision the Commission again awarded Archer $10,000 in attorney fees, to be paid equally by the surety and ISIF. Archer appealed this decision. Shortly thereafter this Court issued an alternative writ of prohibition requiring the Commission to show cause why it should not be required to refrain from enforcement of its decision

of December 1986. Upon the motion of the employer, Archer's appeal was remanded to the Commission "for further hearings and reconsideration of its prior orders in light of the ALTERNATIVE WRIT OF PROHIBITION issued by this Court on the 2nd day of February, 1987 and made permanent and peremptory by Order of even date herewith."

Upon remand the Commission withdrew all previous decisions and awards and substituted a new decision. In this new decision the Commission found that Archer could not effectively compete in a labor market for regular established gainful employment and that his permanent physical impairment combined with non-medical factors rendered him totally and permanently disabled under the odd-lot doctrine. The Commission apportioned fifty percent of the liability for Archer's total permanent disability to the employer and ordered the remainder of the income benefits to be paid by ISIF. The Commission also found that the employer had neglected to pay some of Archer's medical expenses and awarded Archer attorney fees of thirty-three and one-third percent of all income benefits awarded to him, including all amounts previously paid as permanent partial impairment or disability compensation. The employer, its surety and ISIF have appealed these decisions of the Commission.

## II.

### THERE IS SUBSTANTIAL COMPETENT EVIDENCE TO SUPPORT THE ODD–LOT DETERMINATION.

■ The employer and ISIF argue that there is not substantial competent evidence to support the finding of the Commission that Archer was totally and permanently disabled under the odd-lot doctrine. This Court has repeatedly held that odd-lot status is a factual determination within the discretion of the Commission and that we will sustain the Commission's finding on this issue, if it is supported by substantial competent evidence. *Kindred v. Amalgamated Sugar Co.*, 114 Idaho 284, 291, 756 P.2d 401, 408 (1988). There is substantial

evidence to support the Commission's finding that Archer was in the odd-lot category.

The Commission found that Archer suffered a permanent physical impairment equal to forty percent of the whole man. The testimony before the Commission clearly supports this finding. In his deposition of October 8, 1985, Dr. O'Keefe testified that Archer had a twenty percent impairment related to the right knee. Although some question arose as to what part of that impairment was due to arthritis, Dr. O'Keefe testified that there were no objective findings that would indicate the existence of arthritis in Archer's right knee. (Deposition of Dr. O'Keefe of October 8, 1985, pp. 47–48 and 51.) A panel of doctors that examined Archer also evaluated the permanent impairment due to the injury to his right knee at twenty percent of a whole person. Although he had previously testified differently, in his deposition of August 2, 1985, Dr. Blaisdell stated that because of the brace that Archer was required to wear on his left knee, the impairment of that knee should be rated at fifty percent of the extremity or twenty percent of the whole person. (Deposition of Dr. Blaisdell of August 2, 1985, pp. 26–7 and 35–6.) Dr. O'Keefe accepted Dr. Blaisdell's rating of the left knee.

In arriving at a finding that Archer was totally and permanently disabled under the odd-lot doctrine the Commission relied on the testimony of Archer that he had applied for a variety of jobs at local businesses and had received no job offers. He also testified that he had been unable to secure employment of any nature either on his own or with the assistance of the Department of Employment or the Veterans Administration. The Commission found that there had been no showing that some kind of suitable work was regularly and continuously available to Archer, nor that there was an actual job within a reasonable distance of Archer's home that he was able to perform or for which he could train and in which he had a reasonable opportunity to be employed. There was substantial competent evidence to support these findings. We affirm the Commission's determination that Archer was totally and permanently disabled under the odd-lot doctrine.

III.

### *MAPUSAGA* REVISITED AND REVISED.

The apportionment of liability for Archer's total permanent disability was based on the twenty percent impairment ratings that had been given for each of Archer's knees. ISIF asserts that there was not substantial evidence that Archer's impairment due to his left knee was a subjective hindrance to reemployment as required by I.C. § 72–332(2) (1988). This statute provides that in determining the liability of ISIF for a portion of a worker's total permanent disability because of a pre-existing permanent physical impairment, the impairment "shall be interpreted subjectively as to the particular employee involved." *Id.*

In *Mapusaga v. Red Lion Riverside Inn*, 113 Idaho 842, 847–48, 748 P.2d 1372, 1377–78 (1987) we concluded that a proper analysis of I.C. § 72–332(2) involves a two-step process:

(1) whether the injured claimant considers the pre-existing impairment an obstacle or hindrance to further employment, and, if so, (2) whether a reasonable employer under the circumstances would consider the claimant's impairment to be of such a nature that any subsequent injury combined with the impairment would more likely make the claimant totally and permanently disabled.... If both requirements are met, a claimant will be considered to have a "permanent physical impairment" within the meaning of I.C. § 72–332(2).

Today, we acknowledge that the two-step process announced in *Mapusaga* did not correctly interpret the 1981 amendment to I.C. § 72–332(2). To this extent we overrule *Mapusaga* and *Garcia v. J.R. Simplot Co.*, 115 Idaho 966, 968–70, 772 P.2d 173, 175–77 (1989). However, the result in *Garcia* would not have been different, if the test announced today to replace the *Mapusaga* two-step process had been employed

in *Garcia* by the Court. There was substantial competent evidence to support the Commission's finding that the pre-existing conditions constituted a hindrance and obstacle to Garcia's obtaining employment.

We note at the outset that we are reluctant to revisit a precedent that is of such recent vintage as *Mapusaga*. However, we must always be prepared to correct interpretations of statutes that rely on incorrect premises, especially when an interpretation is clearly in opposition to the intent of the legislature in enacting a law. It is just such a situation in which we find ourselves today. We also note that the claimant, the employer, the surety, and ISIF alike have all argued that the *Mapusaga* test is incorrectly formulated. Today, we revise that test to conform it to the intent of the legislature in enacting I.C. § 72–332(2) in 1981.

The question of what constitutes "permanent physical impairment" under I.C. § 72–332 has had a tortured legislative and judicial history. From 1971 until 1978, I.C. § 72–332(2) defined this term to mean "any permanent condition, whether congenital or due to the injury or disease, of such seriousness as to constitute a hindrance or obstacle to obtaining employment or to obtaining re-employment if the employee should become unemployed." This Court interpreted this version of the definition as not requiring actual hindrance to employment and as meaning that an "objective test" must be utilized to determine whether a claimant has a pre-existing permanent physical impairment. *Curtis v. Shoshone County Sheriff's Office*, 102 Idaho 300, 629 P.2d 696 (1981); *Gugelman v. Pressure Treated Timber Co.*, 102 Idaho 356, 630 P.2d 148 (1981); *Shea v. Bader*, 102 Idaho 697, 638 P.2d 894 (1981); and *Royce v. Southwest Pipe of Idaho*, 103 Idaho 290, 647 P.2d 746 (1982).

In distinguishing between an objective and a subjective test to determine whether or not a pre-existing condition constituted a hindrance or obstacle to employment, we note that in *Gugelman* we said:

The Commission found that 50% of claimant's current disability was attributable to the October 2, 1975, accident, with 50% being attributable "to a preexisting condition which did not constitute, *subjectively*, a hindrance or obstacle to Claimant's employment prior to October 2, 1975." The Commission stated that its decision that the pre-existing condition was not a hindrance or obstacle to employment was based solely on claimant's testimony. In so holding, the Commission stated that *"[i]t has always been the position of the Industrial Commission that the test to be applied to determine whether or not a pre-existing condition constituted a hindrance or obstacle to employment was a subjective one, i.e., whether or not the pre-existing condition constituted a hindrance or obstacle to employment for the particular injured worker involved."* The Commission then held that the I.S.I.F. was not liable for any part of claimant's total disability payments.

102 Idaho at 358, 630 P.2d at 150 (emphasis added).

In 1978 the legislature amended I.C. § 72–332 by deleting subsection (2) entirely. 1978 Idaho Sess.Laws, ch. 264, § 9, pp. 572, 580. This eliminated any definition of "permanent physical impairment" from I.C. § 72–332. In 1981 the legislature restored the definition and added to it:

(2) "Permanent physical impairment" is as defined in section 72–422, Idaho Code, provided, however, as used in this section such impairment must be a permanent condition, whether congenital or due to injury or disease, of such seriousness as to constitute a hindrance or obstacle to obtaining employment or to obtaining reemployment if the claimant should become employed. *This shall be interpreted subjectively as to the particular employee involved, however, the mere fact that a claimant is employed at the time of the subsequent injury shall not create a presumption that the pre-existing permanent physical impairment was not of such seriousness as to constitute such hindrance or obstacle to obtaining employment.*

1981 Idaho Sess.Laws, ch. 261, § 2, pp. 552, 554 (emphasis added).

The first sentence of this new subsection was similar to the version enacted in 1971. The second sentence was entirely new. In *Mapusaga* we said of the new subsection:

The purpose of this amendment is to eliminate those claimants who have had an earlier injury, but have not suffered any loss of *potential* earning capacity. Now, the nature of the inquiry shifts from a hypothetical claimant to the actual claimant involved.

113 Idaho at 847, 748 P.2d at 1377 (emphasis in original). We accept this statement as correctly interpreting the purpose of I.C. § 72–332(2) as enacted in 1981. However, we believe that in formulating the two-step process to determine whether a claimant has a "permanent physical impairment" under I.C. § 72–332(2) the Court failed to implement this purpose.

■ The first misstep we believe the Court made was in defining "subjectively." In *Mapusaga* we said that the definition of "permanent physical impairment" contained in the first sentence of I.C. § 72–332(2) "is to be interpreted subjectively, *i.e.*, whether the employee considers the condition a hindrance." 113 Idaho at 847, 748 P.2d at 1377. Using "subjectively" in this sense departs from the manner in which the Commission had construed the word "subjective" before *Curtis* and *Gugelman:* "[w]hether or not the preexisting condition constituted a hindrance or obstacle to employment for the particular injured worker involved." 102 Idaho at 358, 630 P.2d at 150. We are now convinced that in the aftermath of *Curtis, Gugelman, Shea* and *Royce,* it was the Commission's construction of "subjectively" that the legislature intended when it added I.C. § 72–332(2) in 1981.

There is no evidence to support the theory that in 1981 the legislature intended to have "permanent physical impairment" interpreted according to whether the claimant considered the condition a hindrance. There is evidence in the form of the Commission's consistent interpretation before *Curtis* and *Gugelman* that when the legislature used "subjectively," it intended to return the focus to the particular worker, not just to the particular worker's state of mind. This Court's own statement in *Mapusaga* of the purpose of the new subsection (shifting from the hypothetical claimant to the actual claimant) verifies this construction.

■ By focusing on the claimant's state of mind in the first step of the two-step process in *Mapusaga,* the Court elevated what otherwise would have been only an evidentiary issue (whether the claimant considered the condition to be a hindrance) to a substantive part of the test. Whether the claimant considered the condition to be a hindrance should not be determinative. We can imagine that a hypochondriacal claimant might consider any condition to be a hindrance. On the other hand, a heroic claimant who refuses to be disabled might consider even a serious condition not to be a hindrance. While the claimant's attitude toward the condition is some evidence whether it was a hindrance, we now declare that the claimant's attitude does not necessarily play a decisive role in determining whether a "permanent physical impairment" exists under I.C. § 72–332(2).

■ We also believe that the second step of the *Mapusaga* two-step process needs to be reformulated to eliminate the suggestion that expert testimony is necessary to provide evidence upon which the Commission may find a "permanent physical impairment" that will cause ISIF to be responsible for a portion of the claimant's total permanent disability. To the extent that *Mapusaga* relied on *Curtis* and *Gugelman* in formulating this second step, we now believe that the Court incorrectly continued to focus on the objective test articulated in those cases. Apparently, the Court thought that the insertion of the first step that focused on the claimant's subjective attitude toward the condition sufficiently neutralized the objective standard contained in the second step. However, the first step did not convert the *Curtis–Gugelman* objective test into a subjective test as intended by the legislature in 1981. We conclude that the formulation of

the Commission prior to *Curtis* and *Gugelman* is the correct test: whether or not the pre-existing condition constituted a hindrance or obstacle to employment for the particular claimant.

While this may seem like a simplistic test to some, as we now see what the legislature intended in 1981, it is the most succinct and meaningful test we can provide for the Commission and for those who appear before the Commission. Under this test, evidence of the claimant's attitude toward the pre-existing condition, the claimant's medical condition before and after the injury or disease for which compensation is sought, nonmedical factors concerning the claimant, as well as expert opinions and other evidence concerning the effect of the pre-existing condition on the claimant's employability will all be admissible. No longer will the result turn merely on the claimant's attitude toward the condition and expert opinion concerning whether a reasonable employer would consider the claimant's condition to make it more likely that any subsequent injury would make the claimant totally and permanently disabled. The result now will be determined by the Commission's weighing of the evidence presented on the question of whether or not the pre-existing condition constituted a hindrance or obstacle to employment for the particular claimant.

## IV.

### THERE WAS SUBSTANTIAL COMPETENT EVIDENCE TO SUPPORT THE APPORTIONMENT OF LIABILITY TO ISIF.

■ Using the new test we have announced today, we find substantial competent evidence to support the finding of the Commission that the pre-existing condition of Archer's left knee was a permanent physical impairment under I.C. § 72–332. There is evidence not only of the medical condition of this knee before the injury to the right knee, but also evidence that the condition of the left knee required Archer to wear a brace and had impeded his employability from time to time after 1976.

Therefore, we conclude that the Commission was correct in apportioning fifty percent of Archer's total permanent disability to ISIF.

## V.

### ARCHER COULD NOT BE REQUIRED TO RETRAIN BEFORE BEING EVALUATED FOR PERMANENT DISABILITY.

ISIF contends that the Commission should not have determined the degree of Archer's total permanent disability without first requiring him to cooperate in and pursue reasonable and practicable efforts to retrain. As a subsidiary issue, ISIF asserts that the Commission abused its discretion by not allowing ISIF to put on evidence of the reasonableness, necessity and appropriateness of retraining following the remand by this Court.

We note that a hiatus occurred in the proceedings before the Commission because of the order of remand issued by this Court on April 17, 1987. By that order we remanded the case to the Commission "for further hearings and reconsideration of its prior orders in light of the ALTERNATIVE WRIT OF PROHIBITION issued by this court on the 2nd day of February, 1987 and made permanent and peremptory by Order of even date herewith." The alternative writ ordered the Commission to refrain from enforcement of its decision of December 17, 1986, or show cause why it should not be permanently and absolutely commanded to comply with the writ. It said nothing about the subsequent decision of the Commission of January 9, 1987, that was appealed by Archer. When the alternative writ was made permanent and peremptory no reference was made to the Commission's new decision of January 9, 1987. The significance of this omission is that the new decision of the Commission gave Archer the option of pursuing retraining at North Idaho College instead of North Seattle Community College, so that he would not have been required to relocate outside of the state of Idaho. Since one of the premises of the alternative writ was that the Commission's decision of De-

cember 17, 1986 required Archer to relocate in order to obtain retraining, a hiatus was created as to the status of the Commission's decision of January 9, 1987, allowing Archer to pursue retraining without relocating.

■ By the Commission's decision of September 4, 1987, all previous decisions and awards of the Commission were withdrawn and rendered null and void, and this new decision was substituted for them. The Commission declined to hear any new evidence concerning retraining and acceded to the request of Archer to evaluate the degree of his permanent disability. While we are not convinced that the Commission was required by the order of remand to withdraw and render null and void all of its prior decisions, we accept the authority of the Commission to do so. The order of remand authorized the Commission to reconsider its prior orders and directed that the record in this appeal be augmented by the "hearings and determination" of the Commission. We interpret the Commission's action on remand to indicate that it did not consider retraining to be appropriate under the circumstances. We acknowledge the authority of the Commission to reject retraining as a part of its disposition of this matter.

I.C. § 72–450 (1988) provides:

Following a hearing or informal conference upon motion of the employer, the employee or its own motion, if the commission deems a permanently disabled employee, after the period of recovery, is receptive to and in need of retraining in another field, skill or vocation in order to restore his earning capacity, it may authorize or order such retraining and during the period of retraining or any extension thereof, the employer shall continue to pay the disabled employee, as a subsistence benefit, temporary total or temporary partial disability benefits as the case may be. The period of retraining shall be fixed by the commission but shall not exceed fifty-two (52) weeks unless the commission, following application and hearing, deems it advisable to extend the period of retraining, in which case the increased period shall not exceed fifty-two (52) weeks.

I.C. § 72–428(6) (1988) provides:

Following the period of recovery, a permanently disabled employee who has been afforded vocational retraining under a rehabilitation program shall be rated for permanent impairment only until completion of the vocational retraining program at which time he shall be rated for permanent disability, deducting from any monetary award therefor amounts previously awarded for permanent impairment only.

ISIF argues that when these statutes are read together they compel the Commission to defer evaluating the permanent disability of an employee for whom retraining has been provided until the retraining has been completed. We disagree. Nothing in either of these statutes requires the Commission to order retraining for an employee. Here, Archer indicated at least as early as October 1986 that he wished to have the Commission determine the degree of his permanent disability. After the remand to the Commission by this Court in April 1987, Archer renewed his request for the Commission to determine the degree of his disability. Whatever had been his receptiveness to retraining before, Archer made it very plain that he did not want to be retrained pursuant to I.C. § 72–450. The Commission was within its authority not to receive any further evidence on this question and to proceed with its evaluation of Archer's permanent disability.

## VI.

### THE AWARD OF ATTORNEY FEES ON THE GROUND STATED WAS IMPROPER.

■ The Commission awarded attorney fees to Archer from the employer on the ground that the employer neglected to pay certain medical bills that were outstanding at the time of the hearing on September 12, 1985. The four bills specified were those owed to Bonner General Hospital, Dr. Leedy, Dr. Wiesenhutter, and Alpha Clinical Laboratory, Inc. The record here con-

vinces us that the bills from the hospital and from Dr. Leedy had been paid and were not outstanding on September 12, 1985. The record also indicates that the bill from Dr. Wiesenhutter was dated August 19, 1985, and was sent to Archer. The billing was received by the employer's surety on September 25, 1985, and was paid on September 30, 1985. The billing from the laboratory was for tests performed on August 19, 1985, and was sent to Archer. It was received by the employer's surety on October 18, 1985, and was paid on October 24, 1985. The total of all these bills was $115.20. We reverse the award of attorney fees on the ground stated.

In the decision of the Commission in August 1986, the Commission awarded attorney fees to Archer in the amount of thirty-three and one-third percent of all compensation paid or to be paid to him. This award was based on a finding that the employer's surety had neglected or refused to pay compensation justly due and owing the employee. Ironically, the benefits at issue were retraining benefits that had been offered without provision for relocation.

The award of attorney fees by the Commission in the decisions of December 1986 and January 1987 were based on the agreement of the employer's surety and ISIF to share equally in the payment of $10,000 in fees to Archer.

Because we are in doubt whether the Commission may have had some other unstated ground for awarding attorney fees in its last decision, we remand this question to the Commission for further consideration of the award of attorney fees. *Cf. Johnson v. Amalgamated Sugar Co.,* 108 Idaho 765, 768, 702 P.2d 803, 806 (1985).

## VII.

### CONCLUSION.

We affirm the decisions of the Commission determining that Archer was totally and permanently disabled under the odd-lot doctrine and apportioning liability to ISIF. We reverse the Commission's decision awarding Archer attorney fees from the employer and remand this issue to the Commission for further consideration.

In view of the mixed result we have reached, we award no costs or attorney fees on appeal.

BAKES, C.J., and BOYLE and McDEVITT, JJ., concur.

BISTLINE, Justice, specially concurring.

Although I am concurring in the majority opinion, I have not yet fully brought myself to wholeheartedly embrace the majority's rejection of the two part test announced in *Mapusaga* in favor of a return to the objective test this Court announced in earlier cases. The *Mapusaga* two part test was the Court's response reflective of the legislature's 1981 amendment of I.C. § 72–332(2). The *Mapusaga* test therefore reflects the statutory law, and hence is substantive rather than procedural. Substantive law is mine, sayeth the legislature; procedural rules belongeth to the Court. Presently I am not as fully persuaded, as I would prefer to be, that this Court providently usurps the legislative function.

As our opinion points out, I.C. § 72–332(2) now states that permanent physical impairment *"shall be interpreted subjectively as to the particular employee involved, ...."* (Emphasis added.) And, as is also pointed out, the *Mapusaga* majority opinion explained the subjective test, and also gave its reasons for rejecting the objective test in this way:

> However, the legislature has changed the emphasis from any claimant to the specific claimant involved. Under the objective test, a particular claimant who is not hindered by an impairment could still qualify for permanent disability as long as the same impairment on a hypothetical claimant could be considered a hindrance.... Now, the nature of the inquiry shifts from a hypothetical claimant to the actual claimant involved.

*Mapusaga,* 113 Idaho at 847, 748 P.2d at 1377.

The only reason now offered for our rejection of the two part test of *Mapusaga*

is the supposed fact that "[t]here is no evidence to support the theory that in 1981 the legislature intended to have "permanent physical impairment" interpreted according to whether the claimant considered the condition a hindrance." 117 Idaho at 171, 786 P.2d at 562. Yet, our opinion goes on to say, in the same paragraph, that is not what *Mapusaga* should be read as saying:

> There is evidence in the form of the Commission's consistent interpretation before *Curtis* and *Gugelman* that when the legislature used "subjectively," it intended to return the focus to the particular worker, *not just to the particular worker's state of mind.* This Court's own statement in *Mapusaga* of the purpose of the new subsection (shifting from the hypothetical claimant to the actual claimant) verifies this construction.

*Id.* (Emphasis added.)

The final instance in which *Mapusaga* may be misinterpreted is summed up in one line of the opinion: "Whether the claimant considered the condition to be a hindrance should not be determinative." 117 Idaho at 171, 786 P.2d at 562. This has never been the case, under the *Mapusaga* two part test or the objective test. The *Mapusaga* test appropriately makes the claimant's interpretation of and ability to cope with the impairment an initial issue; but *Mapusaga* does not make this the controlling or determinative issue.

It may be that the trial bar over the next series of compensation cases will shed additional light which encourages me in this rather drastic shortening of *Mapusaga's* life span.