# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 41012

| | | |
|---|---|---|
| GARY R. CORGATELLI, | ) | |
| | ) | |
| Claimant-Appellant-Cross Respondent, | ) | Twin Falls, June 2014 Term |
| | ) | |
| v. | ) | 2014 Opinion No. 91 |
| | ) | |
| STEEL WEST, INC., Employer, and | ) | Filed: August 25, 2014 |
| IDAHO STATE INSURANCE FUND, | ) | |
| Surety, | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| Defendants-Respondents-Cross | ) | |
| Respondents, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF IDAHO, INDUSTRIAL | ) | |
| SPECIAL INDEMNITY FUND, | ) | |
| | ) | |
| Defendant-Respondent-Cross | ) | |
| Appellant. | ) | |
| | ) | |

_____

Appeal from the Industrial Commission of the State of Idaho.

The Commission's award of credit to Steel West for benefits paid is <u>vacated</u>.
The Commission's find of liability against ISIF is <u>reversed</u>. This case is
<u>remanded</u> for further proceedings consistent with this Opinion. Costs on appeal
are awarded to Claimant against Steel West and to ISIF against Steel West for its cross-
appeal.

Fred J. Lewis, Pocatello, attorney for appellant.

Jay Meyers, Pocatello, attorney for respondent Steel West, Inc.

Paul B. Rippel, Idaho Falls, attorney for respondent Industrial Special Indemnity Fund.

_____

WALTERS, J., *pro tem*

Gary R. Corgatelli sought worker's compensation benefits from his employer Steel West
and the State of Idaho's Industrial Special Indemnity Fund (ISIF) for a 2005 back injury that he
incurred as a result of his employment. The Idaho Industrial Commission (the Commission)

concluded that Corgatelli had a permanent physical impairment of 15% of the whole person, attributing 5% to an earlier injury in 1994 and 10% to the 2005 injury, and that Corgatelli was totally and permanently disabled. The Commission further concluded that ISIF was liable for disability benefits because the effects of Corgatelli's preexisting impairment from the 1994 injury combined with his 2005 injury to cause total and permanent disability. The Commission subsequently issued an order to clarify that Steel West was entitled to credit on the disability award for permanent physical impairment benefits Steel West previously paid to Corgatelli for his 2005 injury. Corgatelli appeals the Commission's order to credit Steel West. ISIF cross-appeals the Commission's determination of ISIF liability. As will be explained, we vacate in part the credit allowed to Steel West for payments made to Corgatelli as permanent impairment benefits, and we reverse the Commission's determination of ISIF liability.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Corgatelli was born in 1947. In 1973, he began employment with Steel West as a fitter and welder. In the 1980s, Steel West promoted Corgatelli several times, and he eventually held the position of shipping and receiving and paint foreman. In this position, Corgatelli supervised the receiving, unloading, sandblasting, and painting of all steel, and he also drove delivery trucks.

On October 4, 1994, Corgatelli's first work-related injury occurred while pushing a load of steel off a delivery truck. He complained of low back and left buttock pain from the injury. Corgatelli filed a worker's compensation complaint on October 11, 1994. Gail Fields, D.O., examined Corgatelli, and Dr. Fields awarded Corgatelli a permanent physical impairment of 5% of the whole person. Kevin Hill, M.D., also examined Corgatelli, but Dr. Hill awarded Corgatelli no impairment rating for the injury. Steel West and Corgatelli executed a lump sum settlement agreement wherein Steel West agreed to pay Corgatelli $27,500 for the worker's compensation claim.

After the injury, Corgatelli was unable to return to the foreman position because he could not tolerate the bending, stooping, and lifting required for the position. He accepted a new position at Steel West as safety director, where he did mostly paperwork, inventory, and limited computer work. He drove delivery trucks and delivered steel within a 35-pound lifting restriction.

On January 3, 2005, Corgatelli's second work-related injury occurred while stepping down from a semi-truck. He experienced immediate back and leg pain. On May 4, 2005, Clark

Allen, M.D., performed a decompressive laminotomy, facetectomy, and excision of herniated disc at L4-5. After the surgery, Corgatelli continued to work at Steel West as a safety director. In August of 2008, Corgatelli experienced increased back and leg pain after making a delivery in Wyoming. After other various treatments, Corgatelli had a posterior lumbar interbody fusion from L2 to L5 on April 6, 2009. Despite the surgery, Corgatelli had continued to have back and leg pain.

On July 15, 2009, Corgatelli filed a worker's compensation claim with the Commission against Steel West, alleging that he suffered a low back injury while stepping off the semi-truck on January 3, 2005. He sought total and permanent disability benefits. On August 4, 2010, David Simon, M.D., diagnosed Corgatelli with failed back syndrome. Dr. Simon awarded Corgatelli a permanent physical impairment of 15% of the whole person, apportioning 5% to the 1994 injury and 10% to the 2005 injury. Dr. Simon also concluded that Corgatelli's condition was medically stationary on August 4, 2010. On January 26, 2011, Corgatelli filed a worker's compensation complaint against the ISIF.

A Commission referee held a hearing and submitted his recommendation to the Commission. The Commission chose not to adopt the referee's recommendation. The Commission concluded that (1) Corgatelli had a permanent physical impairment of 15% of the whole person, attributing 5% to the 1994 injury and 10% to the 2005 injury; (2) Corgatelli was totally and permanently disabled; and (3) ISIF was liable for a portion of Corgatelli's total and permanent disability benefits because the effects of his preexisting impairment from the 1994 injury combined with the effects of his 2005 injury to cause total and permanent disability. Using the formula from the Court in *Carey v. Clearwater County Road Department*, 107 Idaho 109, 686 P.2d 54 (1984), the Commission calculated that Steel West was liable for 66.7% of Corgatelli's benefits for the total and permanent disability, totaling 333.5 weeks of benefits or $99,599.78. ISIF was liable for payment of total and permanent disability benefits 333.5 weeks after August 4, 2010, the date Corgatelli was medically stationary. The Commission denied Steel West's request to offset its liability by the sum it previously had paid for Corgatelli's 1994 injury.

On August 14, 2012, Steel West filed a motion for reconsideration and clarification. Steel West conceded that it did not challenge the Commission's refusal to offset Steel West's liability by the sum it had paid for Corgatelli's 1994 injury. Instead, Steel West sought to offset its liability by the sum it previously paid for Corgatelli's 2005 injury. Corgatelli objected to Steel

3

West's motion. On April 5, 2013, the Commission issued an order to clarify and held that Steel West was entitled to credit the total and permanent disability award with the permanent physical impairment benefits it already paid for Corgatelli's 2005 injury.

Corgatelli appeals the Commission's order to clarify. ISIF cross-appeals the Commission's finding of ISIF liability.

## II. ISSUES ON APPEAL

1.  Whether certain permanent physical impairment benefits previously paid to Corgatelli for his 2005 injury are credited towards Steel West's liability for total and permanent disability benefits.

2.  Whether there is substantial and competent evidence to find that the effects of Corgatelli's preexisting impairment from an earlier injury combined with the effects of his current injury to cause total and permanent disability.

## III. STANDARD OF REVIEW

"When this Court reviews a decision from the Industrial Commission, it exercises free review over questions of law but reviews questions of fact only to determine whether substantial and competent evidence supports the Commission's findings." *Vawter v. United Parcel Serv., Inc.*, 155 Idaho 903, 906–07, 318 P.3d 893, 896–97 (2014). "Substantial evidence is more than a scintilla of proof, but less than a preponderance." *Zapata v. J.R. Simplot Co.*, 132 Idaho 513, 515, 975 P.2d 1178, 1180 (1999). "Substantial and competent evidence is 'relevant evidence which a reasonable mind might accept to support a conclusion.' The Commission's conclusions on the credibility and weight of evidence will not be disturbed unless the conclusions are clearly erroneous." *Vawter*, 155 Idaho at 907, 381 P.3d at 897 (quoting *Boise Orthopedic Clinic v. Idaho State Ins. Fund*, 128 Idaho 161, 164, 911 P.2d 754, 757 (1996)). All facts and inferences are viewed in the light most favorable to the party who prevailed before the Commission. *Zapata*, 132 Idaho at 515, 975 P.2d at 1180.

The Court exercises free review over issues of statutory interpretation. *Sanders v. Bd. of Trs. of Mountain Home Sch. Dist. No. 193*, 156 Idaho 269, 272, 322 P.3d 1002, 1005 (2014).

## IV. ANALYSIS

**A.  The Commission Erred When It Allowed Steel West To Offset Its Liability For Total and Permanent Disability Benefits With Permanent Physical Impairment Benefits Previously Paid To Corgatelli.**

This Court initially notes that our review of this issue is a narrow one because Corgatelli concedes in his briefing that Steel West is entitled to some of the credit awarded by the Commission. At the outset of Corgatelli's brief, he concedes that the Commission properly

4

credited Steel West $10,452.75 of the total credit award of $22,298.75. This conceded sum is attributed to an overpayment of $7,466.25 in benefits for a 5% permanent physical impairment for sexual dysfunction from 2006 to 2007 and to a payment of $2,986.50 in 2010 for an additional 2% permanent physical impairment for the 2005 back injury. Corgatelli contests the remaining sum of $11,964. This contested sum represents the amount paid by Steel West to Corgatelli from February of 2006 to April of 2007 for his 8% permanent physical impairment due to his 2005 back injury. With Corgatelli conceding a portion of the credit award, the only issue on appeal is whether the Commission properly concluded that Steel West was entitled to a credit of $11,964 for the permanent physical impairment benefits paid to Corgatelli from 2006 to 2007 for his 2005 back injury.

1. <u>There is no statutory basis in worker's compensation law to credit the employer for permanent physical impairment benefits paid to the employee before the award of total and permanent disability benefits.</u>

Title 72 of the Idaho Code governs worker's compensation law. I.C. § 72-101.

In worker's compensation cases, the claimant's recovery is typically categorized into types of benefits, such as medical expenses, temporary disability, permanent impairment, and permanent disability (disability in excess of impairment). Because those benefits are determined separately, the claimant's recovery for each type of benefit is an identifiable sum of money.

*Seiniger Law Offices, P.A. v. State of Idaho ex rel. Indus. Comm'n*, 154 Idaho 461, 466, 299 P.3d 773, 778 (2013).

One type of benefit provides compensation to an employee for a permanent impairment. "'Permanent impairment' is any anatomic or functional abnormality or loss after maximal medical rehabilitation has been achieved and which abnormality or loss, medically, is considered stable or nonprogressive at the time of evaluation." I.C. § 72-422. The employee receives a rating for the permanent impairment set in terms of a percentage of the whole man, and then the employee's compensation is calculated pursuant to the statutory guidelines. I.C. §§ 72-424, -426 to -429. These benefits are paid at a percentage of the state average weekly wage. I.C. §§ 72-428 to -429

Another type of benefit compensates the employee for a permanent disability. Permanent disability results "when the actual or presumed ability to engage in gainful activity is reduced or absent because of permanent impairment and no fundamental or marked change in the future can be reasonably expected." I.C. § 72-423. "Income benefits for total and partial disability during the period of recovery, and thereafter in cases of total and permanent disability, shall be paid to

the disabled employee subject to deduction on account of waiting period and subject to the maximum and minimum limits set forth in section 72-409, Idaho Code." I.C. § 72-408. Other than a deduction for the "waiting period" provided in Idaho Code section 72-408, Idaho Code section 72-406(2) provides another deduction:

> Any income benefits previously paid an injured workman for permanent disability to any member or part of his body shall be deducted from the amount of income benefits provided for the permanent disability to the same member or part of his body caused by a change in his physical condition or by a subsequent injury or occupational disease.

I.C. § 72-406(2). In short, pursuant to Idaho Code section 72-406(2), the employer may deduct previously paid permanent disability benefits from an additional award of permanent disability benefits to the same body part. The income benefits for permanent disability are calculated by considering the employee's average weekly wage. I.C. § 72-408(1); *Phinney v. Shoshone Med. Ctr.*, 131 Idaho 529, 533, 960 P.2d 1258, 1262 (1998).

Idaho Code section 72-425 dictates the evaluation of permanent disability. It provides: "'Evaluation (rating) of permanent disability' is an appraisal of the injured employee's present and probable future ability to engage in gainful activity as it is affected by the medical factor of permanent impairment and by pertinent nonmedical factors [as] provided in section 72-430, Idaho Code." I.C. § 72-425 (alteration in original). The nonmedical facts provided in Idaho Code section 72-430 are:

> [1] the nature of the physical disablement, [2] the disfigurement if of a kind likely to limit the employee in procuring or holding employment, [3] the cumulative effect of multiple injuries, [4] the occupation of the employee, [5] and his age at the time of accident causing the injury, or manifestation of the occupational disease, consideration being given to the diminished ability of the afflicted employee to compete in an open labor market within a reasonable geographical area considering all the personal and economic circumstances of the employee, and [6] other factors as the commission may deem relevant . . . .

I.C. § 72-430(1). Permanent disability may be total or partial. "Total and permanent disability may be proven either by showing that the claimant's permanent impairment together with nonmedical factors totals 100% or by showing that the claimant fits within the definition of an odd-lot worker." *Christensen v. S.L. Start & Assocs., Inc.*, 147 Idaho 289, 292, 207 P.3d 1020, 1023 (2009).

The Commission relied on Idaho Code section 72-425 to conclude that Steel West was entitled to a credit for permanent physical impairment benefits previously paid to Corgatelli. As discussed above, that statute regulates the evaluation of permanent disability. I.C. § 72-425. The

6

statute is silent, however, with respect to any matter regarding the calculation of income benefits, let alone a benefit credit or deduction. Therefore, this Court concludes that the Commission erroneously relied on Idaho Code section 72-425 to provide Steel West a credit for income benefits because Idaho Code section 72-425 relates to the evaluation of the employee's permanent disability and not the computation of benefits.

Examining worker's compensation law as a whole, *Roe v. Albertson's Inc.*, 141 Idaho 524, 528, 112 P.3d 812, 816 (2005), this Court finds that there is no statutory basis for the Commission to award Steel West a credit for permanent physical impairment benefits previously paid to Corgatelli. Idaho Code section 72-408, which awards the employee income benefits for permanent disability, only offers a deduction "on account of waiting period." The current version of the statute provides for no other deductions. Notably, an earlier version of Idaho Code section 72-408, then-codified at Idaho Code section 72-310(a), allowed for a deduction for "partial disability" along with the waiting period deduction. I.C. § 72-130(a) (1969); *see also Endicott v. Potlach Forests*, 69 Idaho 450, 452, 208 P.2d 803, 804 (1949). However, this statute was repealed in 1971 when the Legislature recodified Idaho's worker's compensation law. Ch. 124, § 1, 1971 Idaho Sess. Laws 422, 424. Thus, the current version of Idaho Code section 72-408, which provides for the employee such as Corgatelli to receive total and permanent disability benefits, includes no deduction or credit for previously paid permanent impairment benefits in its award of disability benefits.

The other relevant statute for the award of disability benefits, Idaho Code section 72-406(2), allows for a deduction of previously paid "permanent disability" benefits for an injury to any member or part of the claimant's body from a new award of permanent disability benefits, but only if the new benefits are provided "to the same member or part of his body caused by a change in his physical condition or by a subsequent injury or occupational disease." I.C. § 72-406(2). Although partial permanent disability benefits are calculated in relation to permanent physical impairment benefits, Idaho Code sections 72-427 to -429, partial permanent disability benefits and permanent physical impairment benefits are two separate forms of compensation. In this case, Corgatelli challenges Steel West's credit for permanent physical impairment benefits paid for the 2005 injury before any finding or award of a subsequent permanent disability. Therefore, Idaho Code section 72-406(2) offers no statutory basis for Steel West to receive a credit for previously paid permanent physical impairment benefits.

7

No other statute in Idaho's worker's compensation law permits the employer to receive credit for permanent physical impairment benefits paid before the award of total and permanent disability benefits. As a purely statutory scheme, the Court cannot judicially construct a credit for employers into worker's compensation law. Our decision is consistent with other jurisdictions that have considered similar issues and interpreted their workers' compensation statutes. *Taylor v. State Accident Ins. Fund*, 595 P.2d 515, 517–18 (Or. Ct. App. 1979); *Durant v. Butler Bros.*, 148 N.W.2d 152, 154–57 (Minn. 1976); *Orvis v. Hutchins*, 179 A.2d 470, 472–74 (Vt. 1962); *Nicely v. Virginia Elec. & Power Co.*, 80 S.E.2d 529, 531–33 (Va. 1954); *see also* 5 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 92.02 (rev. ed. 2014); 100 C.J.S. *Workers' Compensation* § 702 (2014).

Based on the above reasons, the Court finds that the Commission erred in awarding Steel West a credit of $11,964 for the permanent physical impairment benefits paid to Corgatelli in 2006 to 2007 for his 2005 back injury. The Court declines to rule on the validity of the other credited permanent physical impairment benefits which were conceded by Corgatelli on appeal.

**B.     There Is Not Substantial And Competent Evidence To Support The Commission's Finding of ISIF Liability.**

ISIF contends that the Commission erred by subjecting it to liability for Corgatelli's total and permanent disability benefits. ISIF liability is governed by Idaho Code section 72-332(1). That section provides:

> If an employee who has a permanent physical impairment from any cause or origin, incurs a subsequent disability by an injury or occupational disease arising out of and in the course of his employment, and by reason of the combined effects of both the pre-existing impairment and the subsequent injury or occupational disease or by reason of the aggravation and acceleration of the pre-existing impairment suffers total and permanent disability, the employer and surety shall be liable for payment of compensation benefits only for the disability caused by the injury or occupational disease, including scheduled and unscheduled permanent disabilities, and the injured employee shall be compensated for the remainder of his income benefits out of the industrial special indemnity account.

I.C. § 72-332(1). "Under § 72-332(1), a party attempting to prove ISIF liability must show: (1) 'there was a pre-existing impairment'; (2) 'the impairment was manifest'; (3) 'the impairment was a subjective hindrance'; and (4) 'the pre-existing impairment and the subsequent injury in some way combine to result in total permanent disability.'" *Vawter v. United Parcel Serv., Inc.*, 155 Idaho 903, 910, 318 P.3d 893, 900 (2014) (quoting *Bybee v. State, Indus. Special Indem. Fund*, 129 Idaho 76, 80, 921 P.2d 1200, 1204 (1996)). In other words, the party "seeking to

invoke the liability of ISIF" has the burden of proof to meet the requirements under Idaho Code section 72-332(1). *See Garcia v. J.R. Simplot Co.*, 115 Idaho 966, 970, 772 P.2d 173, 177 (1989), *overruled on other grounds*, *Archer v. Bonners Ferry Datsun*, 117 Idaho 166, 169, 786 P.2d 557, 560 (1990).

In this case, ISIF challenges the Commission's factual findings and legal analysis on the fourth requirement only: whether Corgatelli's preexisting impairment and subsequent injury in some way combined to result in total and permanent disability. To satisfy the fourth requirement in Idaho Code section 72-332(1), "the 'but for' standard is the appropriate test to determine whether the total permanent disability is the result of the combined effects of the pre-existing condition and the work-related injury." *Garcia*, 115 Idaho at 970, 772 P.2d at 177. The Court has reiterated the "but for" standard in subsequent cases and it is the controlling test for the "combining effects" requirement. *Eckhart v. State, Indus. Special Indem. Fund*, 133 Idaho 260, 264, 985 P.2d 685, 689 (1999); *Bybee*, 129 Idaho at 81, 921 P.2d at 1205; *Selzler v. State, Indus. Special Indem. Fund*, 124 Idaho 144, 146, 857 P.2d 623, 625 (1993). The "but for" test requires a showing by the party invoking liability that the claimant would not have been totally and permanently disabled but for the preexisting impairment. *Garcia*, 115 Idaho at 970, 772 P.2d at 177.

1.      Substantial and competent evidence does not show that the effects of Corgatelli's preexisting impairment and subsequent injury in some way combined to result in total and permanent disability.

Corgatelli's first accident occurred on October 4, 1994. On October 20, 1994, Dr. Fields examined Corgatelli. After a "normal MRI" reading by radiologist Allen Eng, M.D., Dr. Fields ordered a bone scan. The study of the bone scan read "markedly increased radiotracer uptake . . . at L3-4" and "mild impaction of superior vertebral endplate of L4 laterally to the left either due to a longstanding Schmorl's node or a recent mild impaction." The scan found no evidence of spondylolysis or metastatic disease.

On or about March 3, 1995, neurosurgeon Peter Schossberger, M.D., saw Corgatelli for a second opinion. Dr. Schossberger disagreed with Dr. Eng's reading of the MRI as normal. Dr. Schossberger read the MRI as showing a "considerably different reading from the official reading of normal with normal vertebrae body signal for pulse sequences used, normal nuclear signal, etc." To Dr. Schossberger, the MRI showed (1) "nuclear dehydration at L1-2, L2-3, L3-4, and L4-5;" (2) "evident left posterior superior L4 body Schmorl's node or end plate fracture . . . with increased water signal in the bone marrow of the surrounding L4 body . . . and also some

increased water signal in the posterior inferior L3 body;" (3) "may be some focal tiny left L3-4 disc herniation;" (4) "slight diffuse central L4-5 annulus convexity without definite disc herniation;" and (5) "normal L5-Sl nuclear hydration, annulus, and canal." Dr. Schossberger concluded his evaluation of Corgatelli by stating: "nuclear dehydration at four lumbar levels, multilevel osteophytes, and superior L4 end plate and surrounding bone changes including focally positive bone scan at about left L3-4 are more likely that not degenerative cause and/or a result of cumulative life work lifting activities." Dr. Schossberger referred Corgatelli to Dr. Hill.

On August 17, 1995, Dr. Hill examined Corgatelli. He stated Corgatelli's condition as (1) "Chronic mechanical low back pain sub acute secondary to musculoligamentous injury" and (2) "Degenerative disc and joint disease L1-5. Left facet arthritis L3-4." Dr. Hill also stated that Corgatelli has "significate [sic] degenerative disc and lumbar spine disease."

Due to this injury, Dr. Fields permanently restricted Corgatelli to lifting no more than 35 pounds and recommended that he limit his bending and stooping. He gave Corgatelli a 5% of the whole person impairment rating. Dr. Hill restricted Corgatelli to lifting 50 pounds occasionally, 20 pounds frequently, and 10 pounds constantly and recommended that he limit climbing, sitting, kneeling, squatting, and crawling and avoid bending and stooping at all times. He did not award Corgatelli an impairment rating. Because Corgatelli could not tolerate the bending, stooping, and lifting required for his pre-injury position, he took a $3.00 per hour pay cut and began a new position at Steel West that allowed him to limit those activities and lift no more than 35 pounds.

Corgatelli's second accident occurred on January 3, 2005. Corgatelli returned to Dr. Fields on January 25, 2005. Dr. Fields proposed that Corgatelli was suffering from "degenerative disc disease with lumbar sacral strain or sprain with left sciatica neuralgia symptoms or radiculopathy." Dr. Fields ordered an MRI of Corgatelli's lumbar spine. D.J. Marc Cardinal, M.D., read the MRI as: (1) "canal and foramina are developmentally below average in size;" (2) "L4-5 demonstrates a small disc extrusion laterally at the lateral margin of the left intervertebral foramen severely narrowing the left intervertebral foramen and displacing the left L4 nerve root. Degenerative changes are present mildly narrowing the thecal sac and moderately narrowing the right intervertebral foramen; (3) "At L3-4 degenerative changes are present moderately narrowing the foramina and mildly narrowing the thecal sac; (4) "At L2-3 degenerative changes are present moderately narrowing the right intervertebral foramen and causing mild narrowing of the thecal sac and left intervertebral foramen;" and (5) "At L1-2 degenerative changes are present mildly narrowing the canal and foramina." "Reviewing the report, Dr. Fields commented

that it demonstrated the presence of degenerative disc disease at all levels" and a herniated disc at L4-5. Dr. Fields referred Corgatelli to Dr. Allen.

Dr. Huneycutt first examined Corgatelli on March 1, 2005. On May 4, 2005, Dr. Allen performed a decompressive laminotomy, facetectomy, and excision of herniated disc at L4-5 on Corgatelli. Dr. Allen noted in his operative report that the indications for the surgery were "a far lateral herniated disc and evidence of severe neuroforaminal compression at L4-5 on the left." He also noted that Corgatelli had "significant degenerative changes in his back."

On September 17, 2008, Corgatelli returned to Dr. Allen with back pain, and Dr. Allen ordered an MRI. The MRI study read: (1) "changes of previous left hemilaminectomy at L4-5;" (2) "Multilevel disc bulging with mild central spinal canal stenosis at L3-4 related to the disc bulge, facet joint degenerative changes, and mild prominence in epidural fat;" and (3) "Scattered areas of bilateral neuroforaminal narrowing, most severe on the left at L4-5 where there is near complete effacement of the face surrounding the exiting L4 nerve root. Correlation with pain in the left L4 nerve root distribution is recommended." Following the MRI, Dr. Huneycutt diagnosed Corgatelli with tight foraminal stenosis at L4-5 on the left and degenerative changes throughout the lumbar spine. On October 29, 2008, Dr. Huneycutt responded to an inquiry by ISIF about Corgatelli's return for treatment for back pain, and he stated that Corgatelli's current symptoms were related to his 2005 bank injury and there was no evidence of a new injury. He agreed with ISIF's statement that Corgatelli was "experiencing pain due to a natural progression of his underlying disc disease," and he explained that Corgatelli "is suffering from a progression from his 2005 back injury. . . . evidenced by his report of a return of symptoms and his imaging studies that by comparison reveal a continued decline and failure of his injured disk."

On December 10, 2008, Dr. Simon examined Corgatelli for ISIF and prepared a report (hereinafter 2008 report). He acknowledged Corgatelli's diagnosis from Dr. Hill for the 1994 back injury. Dr. Simon diagnosed Corgatelli with "Left l4 radiculopathy secondary to foraminal stenosis. This radiculopathy as a result of his previous low back injury and the subsequent surgery" and "Status-post L4-5 discectomy on 5/4/05 following a work injury on 1/3/05." He opined that his current low back problems and the 2005 injury had a causal relationship.

After Corgatelli received injection therapy from Dr. Huneycutt, Dr. Allen performed a posterior lumbar interbody fusion from L2 to L5 on April 6, 2009. In a pre-operative examination, Dr. Allen diagnosed Corgatelli with severe disc collapse at L2-3, L3-4, and L4-5 with modic changes mostly at L2-3 and severe neuroforaminal stenosis at all levels. In Dr.

11

Allen's operative report, he stated that the indications for the surgery were severe disc collapse with herniated disc at L2-3, L3-4, and L4-5, and significant far lateral stenosis. Dr. Allen eventually diagnosed Corgatelli with failed back syndrome.

On August 4, 2010, Dr. Simon again examined Corgatelli for ISIF and prepared a report (hereinafter 2010 report). He too diagnosed Corgatelli with failed back syndrome. He opined that there was a causal relationship between Corgatelli's current back problems and the 2005 injury. He also acknowledged that Corgatelli had a back injury from 1994 and that Corgatelli was diagnosed by Dr. Hill for that injury. He did not, however, attribute any of Corgatelli's limitations and restrictions to his 1994 injury. Rather, he stated that Corgatelli's physical work restrictions from an August, 28, 2009, Functional Capacity Evaluation (FCE) "are permanent and they would be related to the [2005] industrial injury."

From the record provided to the Court, it appears that Dr. Simon was the only physician deposed. He testified that he reviewed Dr. Allen's operative report in preparing his 2010 report, and he then was asked, "To what extent would [Dr. Allen's] fusion address anatomic findings that pre-existed the 2005 accident?" Dr. Simon answered:

> Well, the 2005 accident injury affected the L4-5 level and the previous stuff that we talked about back in 1995. The worse level was at the L3-4 level. I'm not a surgeon. I'm not sure why he went up to the L2, but that being closer to the L3-4 level. I mean, that level would also be -- you know, that would more likely be related to the pre-existing problems and the problems at the L3-4 level than the work related at the L4-5 level.

Regarding his 2008 report, Dr. Simon was asked "how much" of the back pain reported by Corgatelli in 2008 was an "aggravation of the 2005 anatomy versus new injury type." He explained that "his thought process" was that Corgatelli's "most significant problem" was at the L4-5 level where he had the herniated disc from the 2005 injury, and therefore his 2008 back pain was related to the 2005 injury. If Corgatelli had complained in 2008 with "the most problems" at the L3-4 level, Dr. Simon explained, his opinion would have been that L3-4 "was the worst area in 1995; this is more likely pre-existing and not related to the 2005 injury."

Due to the aggravation and progression of the 2005 injury, Corgatelli's activities were further restricted. The FCE placed Corgatelli "at a sedentary demand capacity." The FCE observed that Corgatelli could lift up to 20 pounds occasionally and tolerated sitting for no more than 10 minutes. The FCE also noted that Corgatelli was unable to complete hand coordination tasks. Dr. Simon agreed that Corgatelli's restrictions observed in the FCE were appropriate and

permanent. He stated that Corgatelli would never return to his pre-injury status and, as a result of his fusion and ongoing symptoms, Corgatelli would need continued follow-up treatment.

Two vocational rehabilitation experts examined Corgatelli. Mary Barros-Bailey, Ph.D., reviewed the records from Corgatelli's 1994 and 2005 injuries and the restrictions imposed due to those injuries. Dr. Barros-Bailey determined that Corgatelli would not qualify for any work within his restrictions. She noted that Corgatelli had significant functional restrictions from the 1994 injury that resulted in his job change and reduced pay. She attributed 27% of his total disability to the restrictions from the 1994 injury, stating that those restrictions "impacted his wage earning capacity and flexibility within the labor market based on loss of access to jobs he could previously attain." Nancy Collins, Ph.D., reached similar conclusions. Dr. Collins discussed Corgatelli's diagnoses and restrictions from both injuries. She could not think of any job regularly available in the labor market for Corgatelli due to his physical restrictions and lack of skills, and she determined that he was totally disabled. Similar to Dr. Barros-Bailey, Dr. Collins noted that Corgatelli's 1994 injury was "manifest and a hindrance." Dr. Collins explained that Steel West "was able to accommodate his initial restrictions, but even after 36 years of work . . . they were unable to accommodate the most recent restrictions." She stated, "The combination of his pre-existing restrictions and his most recent restrictions leave him so injured he is not regularly employable in any well[-]known branch of the labor market."

Based on this evidence, the Commission concluded that the combined effects of Corgatelli's preexisting impairment from the 1994 injury and the 2005 injury resulted in total and permanent disability. The Commission found it "clear" that Corgatelli's 2009 L2-5 fusion by Dr. Allen was undertaken because of the L4-5 lesion related to the 2005 injury "and the multilevel degenerative changes" in Corgatelli's spine "first noted in 1994, and progressing thereafter." It appears that the Commission relied on three pieces of evidence for this conclusion: (1) the 2005 MRI ordered by Dr. Fields demonstrated severe degenerative changes at levels above and below L4-5; (2) Dr. Allen's "operative report clearly reflects that the indications for the surgery are multifactorial, and not solely related to the need to address the L4-5 level;" and (3) Dr. Simon's testimony that "the 2005 accident injury affected the L4-5 level and the previous stuff that we talked about back in 1995" and that it was "more likely" Dr. Allen "went up to the L2" due to the 1994 injury. Therefore, according to the Commission, "[b]ecause [Corgatelli's] surgery was necessitated by both the subject accident and his preexisting condition, and because

13

[he] had a poor surgical outcome, such that he is currently totally and permanently disabled, it is clear that the combining with element of the prima facie case has been met."

Our review of the Commission's decision reveals that the Commission failed to use the "but for" test to determine whether Steel West satisfied the "combined effects" requirement in Idaho Code section 72-332(1). Instead of the "but for" test, Commission examined whether Corgatelli's preexisting impairment from his 1994 injury and his 2005 injury together "necessitated" the 2009 L2-5 fusion. By inferring that Corgatelli would not have needed the 2009 fusion from L2 to L5 had he not suffered his 1994 injury, the Commission erroneously reasoned that Corgatelli's total and permanent disability after the fusion was the result of the combined effects of his two injuries. Put another way, the Commission erred by determining that Corgatelli was totally and permanently disabled due to the combined effects of the two injuries solely because the combined effects of the two injuries may have influenced the scope of the unsuccessful fusion. However, the inquiry is not whether the combined effects of the claimant's preexisting impairment and current injury required a certain medical procedure that later contributed to total and permanent disability; the inquiry is whether the combined effects of the claimant's preexisting impairment and current injury resulted in total and permanent disability. I.C. § 72-332(1). For this question, the Commission must determine whether the claimant's disability would not have been total *but for* the preexisting impairment. *Bybee v. State, Indus. Special Indem. Fund*, 129 Idaho 76, 80–81, 921 P.2d 1200, 1204–05 (1996); *Garcia v. J.R. Simplot Co.*, 115 Idaho 966, 970, 772 P.2d 173, 177 (1989). As such, the Commission should have further determined whether, but for Corgatelli's preexisting impairment from his 1994 injury, Corgatelli would not have been permanently and totally disabled from the effects of his 2005 injury, which includes the fusion. Without this determination, the Commission's decision is erroneous.

Based on the evidence in the record, this Court holds that Steel West failed to satisfy the "but for" test. While the evidence shows that Corgatelli had severe degenerative changes at levels other than the 2005 injury area, and that the 2005 injury "affected" the 1994 injury area, there is a lack of medical evidence to support the determination that, but for Corgatelli's preexisting impairment from the 1994 injury, he would not have been totally and permanently disabled due to the effects of his 2005 injury. Not one medical expert opined that a combination of Corgatelli's 1994 preexisting impairment and 2005 injury resulted in total and permanent disability. Nor do the various medical documents support a finding that a combination of the two

14

injuries resulted in total and permanent disability. The strongest evidence for Steel West's position—the indications in Dr. Allen's operative report from Corgatelli's 2009 L2-5 fusion—at best supports only an inference that Corgatelli had residual effects from the 1994 injury that exacerbated the effects of his 2005 injury pre-surgery, but those indications say nothing about the combined effects of the 1994 preexisting impairment and 2005 injury post-surgery to result in total and permanent disability. In summary, there is not substantial and competent evidence to show that Corgatelli's disability after the 2005 injury would not have been total but for the preexisting impairment from 1994.

Moreover, it was error for the Commission to determine that both the 1994 injury and 2005 injury necessitated the 2009 L2-5 fusion simply because the surgery addressed more than the L4-5 level. The Court has cautioned agencies in their role as fact-finders against substituting their own lay understanding of medical information to reach a medical opinion commonly reserved to an expert; an agency simply may not use its specialized knowledge as a substitute for evidence presented at a hearing. *Mazzone v. Texas Roadhouse, Inc.*, 154 Idaho 750, 761, 302 P.3d 718, 729 (2013). The Court recognizes that an agency "may, however, utilize its expertise in drawing inferences from the facts or record or to resolve conflicts in the evidence." *Id.* An agency may weigh the evidence provided, but it may not inject its own unqualified medical opinion to draw a conclusion from the evidence. In this case, the Commission exceeded its fact-finding role by relying on its own unsupported medical opinion "that in the absence of multilevel problems, surgeons typically prefer to limit fusion procedures to levels where it is absolutely necessary . . . ." to conclude that the 2009 L2-5 fusion addressed injuries from the 1994 and 2005 accident. There is no medical evidence in the record to support the Commission's medical opinion or reach it by inference from other medical evidence. The Commission's conclusion regarding the scope of 2009 L2-5 fusion was an improper use of its specialized knowledge as a substitute for the evidence.

In conclusion, the Commission erred in substituting its own medical opinion to make findings on the combined effects of Corgatelli's preexisting impairment and current injury. Due to the lack of substantial and competent evidence to support its position, Steel West has not met its burden to show that Corgatelli would not have been permanently and totally disabled but for his preexisting impairment.

**V. CONCLUSION**

The Commission's award to Steel West of a credit for permanent physical impairment benefits previously paid to Corgatelli in 2006 and 2007 for his 2005 back injury is vacated. The Commission's finding of ISIF liability is reversed. This case is remanded for further proceedings consistent with this opinion. Costs on appeal are awarded to the Claimant, Gary Corgatelli, against Steel West and to ISIF against Steel West for its cross-appeal.

Chief Justice BURDICK, Justices EISMANN, J. JONES and HORTON, CONCUR.